UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CIVIL DIVISION

CASE NO.:

SUSAN KHOURY,

        Plaintiff,

v.

THE MIAMI-DADE COUNTY
SCHOOL BOARD, a political
subdivision of the State of Florida and
GREGORY WILLIAMS, a resident
of the State of Florida

        Defendants.
_____/

**COMPLAINT**

Plaintiff, SUSAN KHOURY ("Ms. Khoury"), brings this Complaint against the MIAMI-DADE COUNTY SCHOOL BOARD ("School Board") and GREGORY WILLIAMS ("Mr. Williams" or "Officer Williams") and allege the following:

**THE PARTIES, JURISDICTION, AND VENUE**

At all times material to this action:

1. Ms. Khoury was a citizen of the State of Florida, and a resident of Miami-Dade County, Florida.

2. Defendant, School Board, was a public entity incorporated under the laws of the State of Florida, and is responsible for establishing, organizing, operating and policing all public schools and its property within Miami-Dade County.

3. Defendant, Gregory Williams, was a resident the State of Florida and an officer with the Miami-Dade County School Board Police Department.

4. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983. Ms. Khoury also request this Court to exercise supplemental jurisdiction over her state law claim pursuant to 28 U.S.C. § 1367(a) because it arises out of the same operative nucleus of facts. Venue is proper because the events giving rise to this claim all occurred within Miami-Dade County, Florida.

## THE FACTS GIVING RISE TO THE CLAIM

5. Ms. Khoury and/or her mother lived at 6120 SW 94 Place in Miami-Dade County for over 37 years.

6. Ms. Khoury's mother passed away in 2009, and since then, Ms. Khoury has been the owner. Obviously, Ms. Khoury's home has emotional and economic value to her.

7. Before the incidents giving rise to this claim, Ms. Khoury never had a problem with anyone who lived in her neighborhood or frequented the area.

8. This all changed in approximately 2010 when the School Board allowed Glades Baseball Softball League, Inc. ("GBSL") to expand its baseball and softball games and practices at Glades Middle School, located at 9451 SW 64 Street in Miami-Dade County.

9. The School Board's contract allowed GBSL to have virtually unfettered access to the baseball fields, except for school hours.

10. Since 2010, GBSL has played baseball and softball games virtually *every night* of the week, and also on Saturdays.

11. Ms. Khoury's home is exactly one house over from the entrance to the baseball fields.

12. The effects of this contract on the immediate neighbors are totally unacceptable for any citizen, let alone long-time homeowners and taxpayers.

13. Ms. Khoury and approximately 40 of her neighbors consistently lodged complaints to the School Board,[1] State Representatives, County Commissioners, and Code Enforcement about the problems related to the School Board's contract with GBSL.

14. For example, participants in the league destroyed many of the residents' lawns by parking their cars on the grass virtually every night of the week.

15. GBSL participants and observers left trash in the yards, knocked down mailboxes, and ran over plants.

16. On one occasion, Ms. Khoury's neighbor had all four tires slashed because she called the police on a GBSL participant/observer for completely blocking her driveway. She was a prisoner in her own home.

17. Before this lawsuit, many of Ms. Khoury's neighbors were unable to sleep comfortably because the lights to the baseball fields illuminated their homes, and were left on until approximately 11:30 p.m. every night of the week.

18. As a result, Ms. Khoury and her neighbors consistently called the School Board and the School Board Police begging for help.

19. Most of the time, the School Board ignored their complaints.

20. The School Board Police either did not respond, or told them to call the Miami-Dade Police Department.

21. The School Board and its police department ignored the residents because many of its officers' children, including a captain, participated in the Glades baseball league.

---

[1] Ms. Khoury even appeared before the school board twice to express her concerns.

22. On one occasion, Ms. Khoury reported the captain to internal affairs for misusing his government vehicle for personal purposes and transporting children in that vehicle – the complaint originated when he continuously blocked the sidewalk with his police car.

23. After the captain was notified of Ms. Khoury's complaint, he parked his car next to her home and made disparaging and derogatory comments toward her.

24. Ms. Khoury continuously expressed to the School Board that it is impossible for its officers to be impartial when many of their children participate in the Glades baseball league.

25. As retribution against Ms. Khoury, someone plastered a flyer in her neighborhood with a picture of her and the caption, "Be On the Look Out for Susan Ann Khoury … A Danger to Our Kids."

26. Ms. Khoury suspects that a police officer is responsible because this photo was only available to law enforcement; it could not be obtained via public records.

27. Ms. Khoury continuously notified the School Board and its members of the parking, lighting, harassment, and garbage problem.

28. Even so, Ms. Khoury had only two requests to the School Board: (1) lock the gate to the field entrance adjacent to her house, which would force GBSL participants and observers to park in the school's parking lot; and (2) require GBSL to darken the lights at a reasonable hour.

29. The School Board gave Ms. Khoury a "roundabout" promise to comply, but it hardly ever did.

30. The problem became so bad that Ms. Khoury began photographing the unlocked gates and improperly parked cars.

31. GBSL members and the School Board Police, however, were determined to quiet her.

32. The battle between Ms. Khoury, the most outspoken of the homeowners, and GBSL/School Board Police climaxed on or about January 29, 2015.

33. That day, Ms. Khoury walked around her neighborhood for exercise.

34. She noticed that two vehicles were improperly parked adjacent to the baseball field, and that the gate to the baseball field was unlocked.

35. Ms. Khoury took a photograph with her phone to inform the School Board that the parking/gate problem had not been resolved.

36. A GBSL parent/observer Doris Zubillaga ("Ms. Zubillaga") noticed Ms. Khoury photographing the gate; Ms. Zubillaga exited her vehicle, and began screaming at Ms. Khoury.

37. To avoid conflict, Ms. Khoury walked away and advised Ms. Zubillaga to call the police if she was unhappy with Ms. Khoury's photography.

38. Ms. Khoury continued on her walk, but remained in close proximity to the field just in case an officer responded.

39. Approximately 15 minutes later, Ms. Khoury noticed School Board Police Officer Gregory Williams arrive in his marked patrol vehicle. Ms. Khoury found this odd because the School Board Police hardly every responded to her calls for assistance.

40. Officer Williams exited his vehicle and spoke to Ms. Zubillaga.

41. Ms. Khoury walked towards them, but remained across the street to let Officer Williams know that she was avoiding any potential conflict with Ms. Zubillaga and had not done anything wrong.

42. After speaking to Ms. Zubillaga, Officer Williams opened another locked gate, which Ms. Khoury found odd, and then walked across the street.

43. Officer Williams asked Ms. Khoury to speak with him next to his vehicle.

44. Ms. Khoury declined because Ms. Zubillaga was still standing next to his vehicle. Ms. Khoury asked to speak to Officer Williams away from Ms. Zubillaga to avoid any conflict.

45. Officer Williams then lectured Ms. Khoury about the gate and the altercation with Ms. Zubillaga.

46. Ms. Khoury attempted to explain what had occurred, but Officer Williams was disinterested in her side of the story. Officer Williams turned his back and began to walk away.

47. Ms. Khoury asked Officer Williams, "Why did you open the gate?" Officer Williams replied, "I can open any of the gates any time I want."

48. Ms. Khoury twice asked Officer Williams for his name. He refused both requests and continued to walk toward Ms. Zubillaga, who was still standing across the street.

49. At that point, based on her previous experiences with School Board officers, Ms. Khoury became skeptical of Officer Williams's intentions and turned on her phone's video recorder.

50. As can been seen and heard on camera, Ms. Khoury asked Officer Williams for his name. Officer Williams ignored her for a third time and continued to speak to Ms. Zubillaga.

51. Ms. Khoury then walked behind his police cruiser and recorded his license plate and police vehicle number.

52. Although Officer Williams and Ms. Zubillaga were standing approximately 25 feet away, they were also captured in the recording because of where they were standing.

53. Officer Williams noticed that Ms. Khoury's phone was pointed toward him and stated, "Why are your recording me!"

54. Officer Williams violently charged toward Ms. Khoury, grabbed her left arm, and twisted it behind her back.

55. Ms. Khoury felt excruciating pain and heard a cracking sound.

56. Ms. Khoury, a 56 year-old, 5'3 woman, screamed in pain and begged Officer Williams to stop.

57. Officer Williams ignored her plea, pushed her against his patrol car, and continued to twist her arm.

58. Ms. Khoury continued to scream, begging him to stop.

59. Ms. Khoury believed that Officer Williams, a former military veteran, was on the verge of breaking her arm.

60. Off-duty Homestead police officer, V. Agosto ("Officer Agosto") came running from the baseball field and assisted Officer Williams in slamming Ms. Khoury to the ground.

61. Officer Agosto thrusted his knee into Ms. Khoury's back and placed his entire weight on top of her.

62. Officer Williams handcuffed both of Ms. Khoury's hands behind her back.

63. Like any woman being unlawfully detained by two male police officers would do, Ms. Khoury cried and screamed for help.

64. Ms. Khoury asked Officer Williams why she was being arrested, but he refused to answer.

65. Ms. Khoury noticed a second School Board officer pull up and speak to Officer Williams.

66. Both Officer Williams and the second officer spoke for a while, picked Ms. Khoury up from the ground, and then flung her into the back of the patrol vehicle.

67. Ms. Khoury again asked Officer Williams why she was being arrested.

68. Officer Williams told Ms. Khoury that he was going to Baker Act[2] her because "she needed help."

69. Officer Williams, however, was first required to transport Ms. Khoury to Kendall Regional Hospital because he dislocated her elbow and nearly broke her arm.

70. Kendall Regional did not have any doctors available for a mental health evaluation on January 29, 2015, the day this incident occurred; therefore, Ms. Khoury was transported to the Miami Behavioral Health Center on January 30, 2015.

71. However, no doctors were available to evaluate Ms. Khoury at Miami Behavioral on January 30, 2015, so she was forced to spend the night, and was not evaluated until the following day, January 31, 2015.

72. After a short evaluation at Miami Behavioral, the doctor immediately recognized what was patently obvious – Ms. Khoury was of sound mind and did not qualify for involuntarily civil commit at a mental health institution.

73. Ms. Khoury has never had any mental health issues her entire life.

74. However, as a result of Officer Williams's actions, Ms. Khoury suffered damages when she was forced to spend a considerable amount of time in a mental health institution.

75. Also, Ms. Khoury has extensive medical bills for the treatment, therapy, and rehabilitation of her dislocated elbow and her back, which are on-going and continuous.

---

[2] Florida's "Baker Act" allows police officers to involuntarily commit citizens to a mental health institution if certain criteria is met; however, Ms. Khoury clearly did not meet it.

76. Ms. Khoury's non-economic damages include, but are not limited to pain and suffering, mental anguish, emotional distress, and are also on-going and continuous.

**COUNT I: DEPRIVATION OF CIVIL RIGHTS; 4TH AMENDMENT FALSE ARREST - SCHOOL BOARD'S FAILURE TO TRAIN OFFICER WILLIAMS**

77. Ms. Khoury re-alleges the allegations contained in paragraphs 1-76 of this Complaint.

78. This action is brought by Ms. Khoury pursuant to title 42, section 1983, United States Code, for the deprivation of her Civil Rights caused by the Miami-Dade School Board, through its police department, and Officer Gregory Williams.

79. The School Board, via Officer Williams, violated Ms. Khoury's Fourth Amendment right to be free from unlawful seizure and detention when Officer Williams wrongly committed her to a mental institutional pursuant to Florida's Baker Act.

80. Based on the information provided to Ms. Khoury's counsel via public records, the School Board failed to train Officer Gregory Williams on Florida's Baker Act statute, which is the criteria to subject a citizen to involuntary civil commitment in a mental institution.

81. The inadequate training was the result of the School Board's deliberate indifference to Ms. Khoury's constitutional right to be free from unlawful seizures and detentions, which include involuntary civil commitments.

82. The School Board was undoubtedly aware of prior incidents where its officers improperly subjected citizens to involuntary civil commitments under Florida's Baker Act.

83. In fact, a couple of years back, the School Board's own staff reported instances where children were being improperly subjected to Florida's Baker Act. These incidents were extensively covered by The Miami Herald, The Miami New Times, and other news agencies.

84. Upon information and belief, as reported by the news, the School Board's prior Chief of Police developed an unwritten policy where his officers improperly subjected citizens to Florida's Baker Act in an effort to minimize the School Board Police Department's crime statistics.

85. Even after the School Board received notice that its prior Chief of Police developed such policy, the School Board still failed to train Officer Williams on the proper criteria to subject citizens to Florida's Baker Act.

86. In light of the duties assigned to police officers, and the illicit policy developed by its former chief, the School Board's need to train Officer Williams was obvious, and the inadequacy of his training resulted in Ms. Khoury being improperly detained and injured.

### COUNT II:  DEPRIVATION OF CIVIL RIGHTS; FIRST AMENDMENT RIGHT TO RECORD - SCHOOL BOARD'S FAILURE TO TRAIN OFFICER WILLIAMS

87. Ms. Khoury re-alleges the allegations contained in paragraphs 1-76 of this Complaint.

88. This action is brought by Ms. Khoury pursuant to title 42, section 1983, United States Code, for the deprivation of her Civil Rights caused by the Miami-Dade School Board, through its police department, and Officer Gregory Williams.

89. The School Board, via Officer Williams, violated Ms. Khoury's clearly established First Amendment right to record a police officer in the course of carrying out his duties.

90. Based on the information provided to Ms. Khoury's counsel via public records, the School Board failed to train Officer Gregory Williams on a citizen's First Amendment right to record police officers.

91. In today's day and age, with iPhones and Androids, the School Board's need to train its officers on a citizen's right to record them especially when they are engaged in activities would directly affect them is so basic, fundamental and obvious that the School Board either knew, or should have known, that such failure to train would result in its officers violating a citizen's First Amendment right to record.

92. As seen and heard on video, Officer Williams became irate when he noticed Ms. Khoury recording him.  Officer Williams yelled to Ms. Khoury, "Why are you recording me!" right before he charged at her and nearly broke her arm.

93. The School Board's failure to train Officer Williams on a citizen's right to record officers caused Officer Williams to react in such a fashion, ultimately causing injury to Ms. Khoury.

94. By failing to train its officers, the School Board was deliberately indifferent to a citizen's right to record and is liable to Ms. Khoury for her injuries.

**COUNT III:  DEPRIVATION OF CIVIL RIGHTS; 4TH AMENDMENT FALSE ARREST - SCHOOL BOARD'S POLICY, CUSTOM OR PRACTICE TO IMPROPERLY SUBJECT CITIZENS TO FLORIDA'S BAKER ACT**

95. Ms. Khoury re-alleges the allegations contained in paragraphs 1-76 of this Complaint.

96. This action is brought by Ms. Khoury pursuant to title 42, section 1983, United States Code, for the deprivation of her Civil Rights caused by the Miami-Dade School Board, through its police department, and Officer Gregory Williams.

97. The School Board violated Ms. Khoury's Fourth Amendment constitutional right to be free from unlawful arrest and detention when Officer Williams subjected her to Florida's Baker Act.

11

98. The School Board, via its police department, developed an unwritten policy, custom, or practice where its officers improperly subjected citizens to the Baker Act, all in an effort to minimize the School Board Police Department's crime statistics.

99. The School Board's policy, custom, or practice of improperly subjecting citizens to the Baker Act showed a deliberate indifference to Ms. Khoury's constitutional right to be free from unlawful arrest and detention.

100. The policy, custom or practice was the driving force behind Officer Williams's decision to Baker Act Ms. Khoury.

101. The School Board knew about the policy, custom, or practice because it was so widespread and persistent that it developed the force of law, to the point where its own staff reported it.

102. The School Board was undoubtedly aware of these incidents because of the extensive coverage by The Miami Herald, The Miami New Times, and other news agencies.

103. Accordingly, the School Board is vicariously liable to Ms. Khoury for her injuries when Officer Williams subjected her to Florida's Baker Act.

**COUNT IV:  DEPRIVATION OF CIVIL RIGHTS; 4TH AMENDMENT FALSE ARREST/IMPRISONMENT - OFFICER GREGORY WILLIAMS**

104. Ms. Khoury re-alleges the allegations contained in paragraphs 1-76 of this Complaint.

105. This action is brought by Ms. Khoury pursuant to title 42, section 1983, United States Code, for the deprivation of her Civil Rights caused by Miami-Dade School Board Police Officer Gregory Williams.

106. Officer Williams improperly caused Ms. Khoury to be involuntarily committed to a mental institution pursuant to Florida's Baker Act, which violated her Fourth Amendment right to be free from illegal seizure and detention.

107. Officer Williams was acting under color of state law as a police officer and intentionally committed such acts.

108. Officer Williams lacked probable cause when he subjected Ms. Khoury to Florida's Baker Act because she was not an immediate threat to herself or members of the community. All she did was ask Officer Williams for his name, and recorded his police vehicle.

109. Officer Williams caused injuries to Ms. Khoury when he caused her to be detained in a mental health institution for a considerable amount of time.

**COUNT V: DEPRIVATION OF CIVIL RIGHTS; 4TH AMENDMENT EXCESSIVE FORCE - OFFICER GREGORY WILLIAMS**

110. Ms. Khoury re-alleges the allegations contained in paragraphs 1-76 of this Complaint.

111. This action is brought by Ms. Khoury pursuant to title 42, section 1983, United States Code, for the deprivation of her Civil Rights caused by Miami-Dade School Board Police Officer Gregory Williams.

112. Officer Williams violated Ms. Khoury's Fourth Amendment right to be free from excessive force when he nearly broke her arm while unlawfully detaining her for filming him.

113. The amount of force used by Officer Williams, a former military veteran, against Ms. Khoury, a 56 year-old woman, was totally unreasonable and caused her to have a dislocated elbow.

114. Ms. Khoury's injury was exacerbated when Officer Williams pushed her against his patrol car and slammed her to the ground, all while he continued to twist her arm.

115. Officer Williams was acting under color of state law as a police officer and intentionally committed such acts.

116. Accordingly, Officer Williams is liable for Ms. Khoury's injuries.

**COUNT VI:  DEPRIVATION OF CIVIL RIGHTS; 1ST AMENDMENT RETALIATION - OFFICER GREGORY WILLIAMS**

117. Ms. Khoury re-alleges the allegations contained in paragraphs 1-76 of this Complaint.

118. This action is brought by Ms. Khoury pursuant to title 42, section 1983, United States Code, for the deprivation of her Civil Rights caused by Miami-Dade School Board Police Officer Gregory Williams.

119. Officer Williams violated Ms. Khoury's First Amendment right to record police officers when he stopped her from filming him.

120. Ms. Khoury was engaged in an activity, *i.e.* recording police officers, which is protected by the First Amendment.

121. Ms. Khoury suffered an adverse action that would likely deter future First Amendment activity.

122. Officer Williams prevented her from recording him by snatching her phone, slamming her to the ground, and nearly breaking her elbow.

123. Ms. Khoury is now traumatized when it comes to recording officers, and Officer Williams's actions are likely to deter her and her neighbors from recording the police.

124. Ms. Khoury's act of recording Officer Williams was a motivating factor which caused him to retaliate against her by slamming her to the ground, dislocating her arm, and subjecting her to Florida's Baker Act.

125. Officer Williams was acting under color of state law as a police officer and intentionally committed such acts and is therefore liable for her injuries pursuant to § 1983.

### COUNT VII:  STATE LAW FALSE ARREST/IMPRISONMENT – SCHOOL BOARD AND OFFICER GREGORY WILLIAMS

126. Ms. Khoury re-alleges the allegations contained in paragraphs 1-76 of this Complaint.

127. This action is brought by Ms. Khoury for false arrest and false imprisonment, pursuant to the School Board's waiver of sovereign immunity under Florida Statute 768.28.

128. The School Board, via Officer Williams, intentionally restrained Ms. Khoury under circumstances that were unreasonable and unwarranted, and without legal authority, which caused Ms. Khoury harm.

129. Specifically, Officer Williams caused Ms. Khoury to be involuntarily committed to a mental institution pursuant to Florida's Baker Act, even though she did not meet the criteria.

130. Ms. Khoury was not an immediate threat to herself or members of the community. All she did was ask Officer Williams for his name, and recorded his police vehicle.

131. Officer Williams injured Ms. Khoury when he twisted her arm behind her back, dislocated her elbow, and caused her to be detained in a mental health institution for a considerable amount of time.

132. Pursuant to the School Board's waiver of sovereign immunity under Florida Statute 768.28, it is liable to Ms. Khoury for her injuries caused by Officer Williams.

WHEREFORE, Plaintiff, Susan Khoury, demands judgment for her economic and noneconomic damages, attorney's fees, the costs of prosecuting this action, and any other relief this Court deems proper and just.

## DEMAND FOR JURY TRIAL

Ms. Khoury demands a jury trial of all issues so triable as of right by a jury.

DATED: 24th day of February 2016.

> Hilton Napoleon, II, Esq., FBN 17593
> RASCO KLOCK  PEREZ NIETO
> 2555 Ponce de Leon Blvd., Suite 600
> Coral Gables, Florida 33134
> Telephone: 305.476.7111
> Facsimile: 305.675.7707
>
> *Counsel for the Plaintiff, Susan Khoury*
>
>
> By: /s/ Hilton Napoleon, II
>       Hilton Napoleon, II