**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 16-CV-20680-RNS

SUSAN KHOURY,

    Plaintiff,

v.

THE MIAMI-DADE COUNTY PUBLIC
SCHOOL BOARD, a municipal corporation,
and GREGORY WILLIAMS, a resident of
the State of Florida,

    Defendants.
_____/

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN OPPOSITION**
**OF DEFENDANT GREGORY WILLIAMS' MOTION FOR SUMMARY JUDGMENT**

    Plaintiff, Susan Khoury ("Ms. Khoury"), hereby submits this *Statement of Material Facts in Opposition of Defendant Gregory Williams' Motion for Summary Judgment*. Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, this document uses the Defendant's numbering scheme wherever there are factual disputes and adds supplemental facts at the end:

    **A.**    **Facts Concerning Plaintiff's Actions Regarding GBSL[1]**

    2. Ms. Khoury was a 56 year-old-woman when this incident occurred. [**Exhibit A** at 9:1].

    3. Ms. Khoury has continuously lived at her place of residence for approximately the past 15 years. [**Exhibit A** at 9:15-19].

---

[1] For purposes of this motion, the "facts concerning Ms. Khoury's actions regarding GBSL," *i.e.* Officer Williams' Statement of Material Facts [D.E. 150 ¶¶ 1-20], are inadmissible to support his claim for immunity. See Fed. R. Civ. Pro. 56(c). Officer Williams testified that, before his encounter with Ms. Khoury on January 29, 2015, he did not know who she was and was totally unaware about any of the incidents that she had because of the baseball league. [**Exhibit C** at 23:1-5; 48:11-12] On that basis, Ms. Khoury requests a standing "relevance" objection regarding ¶¶ 1-20.

4. Ms. Khoury's house is adjacent to the house that is directly across the street from Glades baseball field. [**Exhibit A** at 78:1-80:25].

10. Ms. Khoury and 62 of her neighbors signed a letter and sent it to School Board Member Raquel Regalado voicing their concerns about the baseball league. [**Exhibit A** at 119:12-120:2].

11. Ms. Khoury contacted the School Board about the gates located on SW 62 Avenue. The School Board agreed to lock the gates to encourage GBL participants to park in the parking lot. [**Exhibit A** at 250:20-254:6].

12. Ms. Khoury photographed cars that were illegally parked only after the School Board told her that, according to GBSL league officials, there was no longer a parking issue in her neighborhood. [**Exhibit A** at 155:17-156:23]. Ms. Khoury never intentionally took photographs of children. If a child happened to be in a photograph due to her taking pictures of cars or open gates, that was purely incidental and not her intention. [**Exhibit A** at 190:17-192:8].

13. Ms. Khoury never intentionally took photographs of children. If a child happened to be in a photograph due to her taking pictures of cars or open gates, that was purely incidental and not her intention. [**Exhibit A** at 190:17-192:8].

14. Pursuant to Rule 56(c), the Defendant cannot produce admissible evidence to support his claim. The narratives in the Miami-Dade Police Department incident reports are hearsay statements that Ms. Khoury vehemently disputes. [**Exhibit A** at 201:21-202:24; 206:25-210:12].

15. To the extent that the Defendant relies on the police reports, the Defendant cannot produce any admissible evidence to support his claim. The narratives in the Miami-Dade Police Department incident reports are hearsay statements that Ms. Khoury vehemently disputes. Additionally, Ms. Khoury has never been physically combative or violent toward various neighbors or participants of the league. [**Exhibit A** at 201:21-202:24; 206:25-210:12]. However, many people have approached her who were upset that she photographed their vehicle, as if that is a crime, or the unlocked fences to the baseball fields. [**Exhibit A** at 152:24-25; 172:2-173:12; 278:6-10].

16. The behavior that Ms. Negron described as "strange and erratic," *i.e.* filming parents and children, is listed in paragraph 7 of her statement. [**Exhibit U** at ¶ 7]. As Ms. Khoury explained above, if a person happened to be in one of her photograph, it was purely incidental to her taking pictures of cars or open gates. [**Exhibit A** at 190:17-192:8]. Moreover, Ms. Negron

may have found Ms. Khoury's behavior to be strange because she has a fundamental misunderstanding of whether Ms. Khoury needs "consent" to exercise her constitutional right to photograph illegally parked vehicles in the public right of way and send them to the government.

17. In the portions of the record cited by the Defendant, Ms. Khoury specifically stated "do I know specifically about coordinated efforts, *no*…." (emphasis added). [**Exhibit A** at 213:21-22]. Furthermore, defense counsel "parroted" his theme again and asked Ms. Khoury, "Do you know how this effort was coordinated against you?" Ms. Khoury answered, "I don't know if there was a coordination." [**Exhibit A** at 214:22-215:1].

18. Ms. Negron's opinion about Ms. Khoury's general well-being is irrelevant and inadmissible. She is not a doctor and her personal opinion about the manner in which Ms. Khoury exercises her constitutional rights is irrelevant. Furthermore, Ms. Negron is biased. Her mother managed the baseball league for over 30 years and she has three children who participate in the league. [**Exhibit U**, ¶¶ 2, 3].

19. Ms. Khoury never intentionally took photographs of children. If a child happened to be in a photograph due to her taking pictures of cars or open gates, that was purely incidental and not her intention. [**Exhibit A** at 190:17-192:8]. To the extent Ms. Khoury video recorded adults, she did so to protect herself from false allegations after they verbally or physically attacked her for photographing their illegally parked cars, such as in Doris Zubillaga's case. [**Exhibit A** at 239:2-9].

20. In 2015, the gates to the fields were still unlocked. Ms. Khoury met with a School Board official on January 14, 2015 to address this problem. [**Exhibit A** at 278:14-279:16].

21. Ms. Khoury never recorded Ms. Zubillaga while Ms. Zubillaga was sitting in her car or shined her cell phone's light through Ms. Zubillaga's window. [**Exhibit A** at 286:3-6; 286:19-22]. Ms. Khoury took a photograph of the open gate next to Ms. Zubillaga's improperly parked vehicle. [**Exhibit A** at 278:14-279:16]. Ms. Zubillaga became upset and began to walk aggressively toward Ms. Khoury. [**Exhibit A** at 279:5-11]. Ms. Khoury thought that Ms. Zubillaga might attack her, so Ms. Khoury attempted to walk away from Ms. Zubillaga. [**Exhibit A** at 279:5-11]. Ms. Zubillaga got in Ms. Khoury's face and became verbally aggressive towards Ms. Khoury. [**Exhibit A** at 283:24-284:24]. Ms. Zubillaga told an unknown person on the field, "She's taking pictures of my license tag and I told her that she cannot take

pictures of my tag." [**Exhibit BB**].  Ms. Khoury walked away from Ms. Zubillaga and told her "If you don't like it then call the cops." [**Exhibit A** at 289:13-18].

22. Ms. Khoury never shinned her camera toward the driver's side of Ms. Zubillaga's car. [**Exhibit A** at 278:14-279:16].

23. Ms. Khoury did point her camera phone towards Ms. Zubillaga, but only after Ms. Zubillaga began to walk aggressively towards Ms. Khoury. [**Exhibit A** at 278:14-279:16; 283:24-284:24].

25. Ms. Zubillaga was harassing and threatening towards Ms. Khoury, not the other way around. [**Exhibit A** at 278:14-279:16].  In fact, Ms. Zubillaga had previously confronted Ms. Khoury on two prior occasions and incorrectly "counseled" Ms. Khoury that she had no right to photograph improperly parked vehicles on a public roadway. [**Exhibit A** at 278:4-13].

27. Before Officer Williams was a police officer, he was employed by the United States Army for 24 years and is a Combat War Veteran. **[Exhibit C** at 4:17-25].  He has been on Special Forces missions overseas. **[Exhibit C** at 5:1-25]

29. After speaking to Ms. Zubillaga, Officer Williams walked over to a locked gate leading to the baseball field and unlocked it. [**Exhibit T** ¶ 18].  Officer Williams walked toward Ms. Khoury and asked her to speak to him by his car. [**Exhibit T** ¶ 19; **Exhibit A** at 296:1-7]. Ms. Khoury told Officer Williams that she would be happy to speak to him from where she at (*i.e.* across the street from the baseball field) because his car was located in close proximity to Ms. Zubillaga, who had recently been aggressive towards Ms. Khoury. [**Exhibit T** ¶ 20; **Exhibit A** at 296:1-297:4].

30. Ms. Khoury never refused to speak to Officer Williams, she just did not want to speak to him next to Ms. Zubillaga. [**Exhibit T** ¶ 18-20; **Exhibit A** at 296:1-297:4].

31. During their conversation, Officer Williams was not interested in Ms. Khoury's side of the story. [**Exhibit T** ¶ 20].  As Ms. Khoury tried to explain what happened, Officer Williams began to walk away. [**Exhibit T** ¶ 21].  Ms. Khoury asked Officer Williams, "Why did you open the gate?" Officer Williams responded, "I can open any of the gates anytime." [**Exhibit T** ¶ 21].  Furthermore, Officer Williams never told Ms. Khoury that the cars were legally parked. [**Exhibit A** at 296:1-7].  In fact, it is apparent from the video that Ms. Zubillaga's grey minivan was parked illegally. [**Exhibit BB**].  Ms. Zubillaga parked her minivan on a two-way street facing the opposite direction of traffic. [**Exhibit BB**].  The law requires her to park her vehicle

in the same direction of traffic.[2]  The video evidence undoubtedly calls Officer Williams' credibility into question.

32. As Officer Williams began to cross the street back towards where Ms. Zubillaga was standing, Ms. Khoury asked Officer Williams twice for his name, but he ignored her. [**Exhibit T** ¶ 22]. Ms. Khoury felt as though something was not right and turned on her video camera. [**Exhibit T** ¶ 23].

33. Officer Williams was not nice or calm toward Ms. Khoury. When he saw her filming his vehicle, he stated in an aggressive tone, "Why are you recording me!" [**Exhibit BB**; **Exhibit T** ¶ 26]. Officer Williams then grabbed Ms. Khoury's left arm and twisted it behind her back so hard that he dislocated her elbow. [**Exhibit T** ¶ 28]. Ms. Khoury heard a cracking sound. [**Exhibit T** ¶ 28]. Ms. Khoury began to scream in pain and told the officer that he is hurting her.[3]  [**Exhibit T** ¶ 29].

34. Officer Williams claims that he told Ms. Zubillaga that Ms. Khoury "had every right to record," but in the video, he aggressively approached Ms. Khoury and stated in a threatening tone, "Why are you recording me!" Officer Williams' credibility is clearly an issue in this case. [**Exhibit BB**]. Ms. Zubillaga's statement regarding Ms. Khoury's well-being is completely irrelevant, and even if it is, it is questionable, at best. The video evidence shows that Ms. Zubillaga was upset because she believed that Ms. Khoury took a photograph of her license plate. Ms. Zubillaga stated, "She cannot take pictures of my tag." [**Exhibit BB**].

36. Ms. Khoury never asked Officer Williams whether she could record his police car. [**Exhibit A** at 301:16-22]. He never replied, "Sure, go ahead." [**Exhibit A** at 301:16-22]. The video completely contradicts Officer Williams' testimony. [**Exhibit BB**]**.**

---

[2] Fla. Statute 316.195 states:
(1) Except as otherwise provided in this section, every vehicle stopped or parked upon a two-way roadway shall be so stopped or parked with the **right-hand wheels parallel to and within 12 inches of the right-hand curb** or edge of the roadway.

[3] The Defendant relies on the statements of Judith Negron and Jose Corraliza. First off, not only are these issues clearly disputed, but the defendant is attempting to have the Court rely on witnesses who were clearly not present when this incident first began. Jose Corraliza can be seen in the video wearing white shirt. [**Exhibit BB**]. He arrived on scene after Officer Williams had already aggressively approached Ms. Khoury for filming him, twisted her arm behind her back, and handcuffed her on the ground. [**Exhibit BB**]. Ms. Negron also arrived after Officer Williams already had Ms. Khoury on the ground. [**Exhibit U** ¶¶ 12, 13].

5

38. Ms. Khoury did not walk back across the street. [**Exhibit A** at 298:2-9]. After Officer Williams arrived, she only crossed the street once to film his vehicle. [**Exhibit A** at 298:2-15]. He arrested her immediately thereafter.

39. As seen on the video, Ms. Khoury did not come into close proximity of Officer Williams or Ms. Zubillaga. [**Exhibit BB**]. She crossed the street stood 10-15 yards away from Officer Williams and began recording his tag number. [**Exhibit BB**].

40. Officer Williams' intentions are clearly at issue and a question for the jury. His claim that he aggressively approached Ms. Khoury to "defuse the situation" is nonsensical. [**Exhibit BB**]. Ms. Khoury did not *intentionally* shine the light to her cell phone in Officer Williams' face. [**Exhibit B** at 10:7-17]. He grabbed her arm, twisted it behind her back, and falsely arrested her. [**Exhibit T** ¶ 26-34].

41. Officer Williams charged towards Ms. Khoury. [**Exhibit T** ¶ 26.] Officer Williams grabbed Ms. Khoury's left arm and twisted it behind her back. She felt excruciating pain and heard a crackling sound. [**Exhibit T** ¶ 28]. The "eyewitnesses" did not see the entire incident. [**Exhibit D** at 48:1-11]. The Zubillaga video clearly shows Ms. Khoury on the ground before Officer Agosto and Mr. Corraliza arrived. [**Exhibit BB**].

42. Ms. Khoury testified that she never pushed Officer Williams and he never fell to the ground. [**Exhibit B** at 23:22-24:15].

43. Ms. Khoury never pushed Officer Williams and he never fell to the ground. [**Exhibit B** at 23:22-24:15; 31:16-20].

44. Officer Williams never got up from the ground because he never fell to the ground. [**Exhibit B** at 23:22-24:15; 31:16-20]. Officer Williams never attempted to "help" Ms. Khoury off the ground. He attempted he handcuff her. [**Exhibit B** at 23:22-24:15].

45. In addition to saying call 911, Ms. Khoury also asked people to call Metro-Dade. [**Exhibit B** at 33:2-15].

46. After Officer Williams assaulted Ms. Khoury, she did not cooperate in his false arrest and voluntarily allow him to handcuff her. [**Exhibit B** at 14:6-16:24].

49. Officer Agosto could not articulate anything specific that Ms. Khoury did to cause him concern for Officer Williams' safety. [**Exhibit D** at 55:2-16].

6

50. Officer Agosto could not articulate anything specific that Ms. Khoury did to cause him concern for the public's safety, other than she refused to allow them to handcuff her. [**Exhibit D** at 66:10-67:14; 68:17-69:17].

51. Ms. Khoury resisted Officer Williams and Agosto's aggressive, combative, and erratic decision to handcuff and arrest her for no apparent reason.  [**Exhibit B** at 14:6-16:24].

52. Ms. Khoury did not acquiesce in Officer Williams and Agosto falsely arresting her. [**Exhibit B** at 14:6-16:24].

53. Ms. Khoury resisted Officer Williams and Agosto's aggressive, combative, and erratic decision to handcuff and arrest her for no apparent reason.  [**Exhibit B** at 14:6-16:24].

54. Ms. Khoury has never had a mental illness and was not exhibiting any characteristics of "some sort of mental situation."  [**Exhibit B** at 34:13-19].  Officer Agosto stated the only evidence of his legal conclusion is that Ms. Khoury refused to acquiesce in their illegal arrest of her.  [**Exhibit D** at 55:2-58-14].

55. Officer Agosto could not articulate any facts (as opposed to legalese that all of the School Board's witnesses seemed to practice) where a reasonable person could possibly conclude that she was a serious threat of bodily harm to herself or to others.  She did not hit, spit, bite, punch, or kick anyone.  [**Exhibit D** at 66:10-67:14; 68:17-69:17].

57. Had Officer Agosto tasered Ms. Khoury, he would part of this lawsuit too.  There is something seriously wrong with him if he believes that it is appropriate to taser a woman simply because she is peacefully resisting two large men from falsely arresting her.  [**Exhibit D** at 66:10-67:14; 68:17-69:17].

61. Mr. Corraliza did not observe how this incident began.  [**Exhibit E** at 77:15-16].  If she appeared distressed, it was because two large men assaulted and arrested her for no reason, which Mr. Corraliza did not see.  [**Exhibit B** at 14:6-16:24].

62. Ms. Khoury told Mr. Corraliza that Officer Williams was a School Board officer who illegally attempted to confiscate her phone for recording him.  [**Exhibit E** at 40:1-4; **Exhibit BB**].    Ms. Khoury asked Mr. Corraliza to call the Metro-Dade Police Department.  [**Exhibit BB**]

64. Ms. Khoury told Mr. Corraliza that Officer Williams was a School Board officer who illegally attempted to confiscate her phone for recording him.  [**Exhibit BB**].  Ms. Khoury asked Mr. Corraliza to call the Metro-Dade Police Department.  [**Exhibit BB**].

65. Officer Williams dislocated her elbow and pushed her to the ground. [**Exhibit B** at 14:6-16:24]. If those are kids gloves, then nobody would want to be a kid.

66. The video shows that Mr. Corraliza came to the scene well after this incident started. [**Exhibit BB**]. Officer Williams grabbed Ms. Khoury, twisted her arm behind her back, pushed her to the ground, and handcuffed her. [**Exhibit B** at 14:6-16:24].

67. The video shows that none of the witnesses were present when this incident first took place. [**Exhibit BB**]. Officer Williams applied excessive force by twisting Ms. Khoury's arm so far behind her back that he dislocated her elbow. [**Exhibit B** at 14:6-16:24].

68. Ms. Khoury repeatedly screamed in pain, "You are hurting me! You are hurting me!" [**Exhibit BB**].

69. Officer Williams attempted to grab Ms. Khoury's phone out of her hand. [**Exhibit B** at 18:1-7].

70. Officer Williams or Agosto eventually removed Ms. Khoury's phone from her hand. [**Exhibit D** at 69:22-25].

71. Officer Agosto was attending his son's baseball practice when Officer Williams aggressively approached Ms. Khoury and stated, "Why are you filming me!" [**Exhibit BB**; Exhibit 4; 48:1-11].

74. Ms. Khoury received surgical treatment for her dislocated elbow. [**Exhibit B** at 45:8-19].

75. Ms. Khoury repeatedly screamed in pain, "You are hurting me." [**Exhibit BB**]. Furthermore, when Officer Williams transported Ms. Khoury to Kendall Regional, she "pleaded with him to take the handcuffs off because [she] was in so much pain." [**Exhibit T** ¶ 48].

77. On the video, Officer Williams told Ms. Khoury that he was going to Baker Act her within seconds after he threw her to the ground and attempted to handcuff her. [**Exhibit BB**].

81. As seen on the video, Ms. Khoury never exhibited any of "these" behaviors. [**Exhibit BB**].

82. Ms. Khoury never exhibited rapid eye movement, mood swings, or any other legal term that Officer Williams would like to use to justify his actions. Furthermore, his claim that Ms. Khoury did not understand that he was a police officer is totally ridiculous. The unbiased videos, again, show otherwise. When Ms. Khoury turned on her camera, the very first words out of her mouth were, "Hey *officer*, can you tell me your name please." [**Exhibit BB**]. When

Officer Williams attacked Ms. Khoury, she immediately stated, "False arrest sir, false arrest. I did not do anything wrong." [**Exhibit BB**]. Finally, when Jose Corraliza (Ms. Khoury's neighbor) responded to the scene and Ms. Khoury asked him to "call the police, call Metro-Dade," Mr. Corraliza told her, "Calm down Susan, this is a police officer." [**Exhibit BB**]. Ms. Khoury immediately told Mr. Corraliza that Officer Williams was "a *School Board officer*" and that he tried to take her phone away because she was recording him. [**Exhibit BB**]. Officer Williams was standing right next to Ms. Khoury when she said that to Mr. Corraliza. [**Exhibit BB**].

83. Officer Williams assaulted Ms. Khoury on January 29, 2015, not January 25, 2015. [**Exhibit A** at 278:14-279:3]. Furthermore, Ms. Khoury was not a threat to anyone. [**Exhibit D** at 66:10-67:14; 68:17-69:17; **Exhibit E** at 71:12-15].

84. All of the School Board witness have clearly practiced there legalese, but all suffer from the same inability to articulate facts to fit with their legal conclusions, including Ms. Negron. [**Exhibit U**].

85. Ms. Khoury screamed in pain because Officer Williams almost broke her arm. Furthermore, she did not cooperate with being falsely arrested, which she is under no obligation to do. She was not "out-of-control." [**Exhibit B** at 14:6-16:24].

86. Ms. Khoury is under no obligation to cooperate with a false arrest. [**Exhibit B** at 14:6-16:24].

87. Mr. Corraliza was not present when this incident occurred. [**Exhibit E** at 77:15-16]. As seen on the video, he came after Officer Williams had already twisted Ms. Khoury's arm, threw her to the ground, and handcuffed her. [**Exhibit BB**]. Also, he testified that she was not a threat to anyone. [**Exhibit E** at 71:12-15; 85:3-9].

88. Mr. Corraliza must have gone to the same law enforcement school as Officer Agosto. It is shocking that a supposed law enforcement officer would taser a handcuffed woman who is laying on the ground. [**Exhibit E** at 71:12-15; 85:3-9]. Mr. Corraliza would have been part of this lawsuit too.

90. Based on the totality of the circumstances, Officer Williams could not have possibly believed that Ms. Khoury met the Baker Act criteria. [**Exhibit B** at 14:6-16:24].

92. The doctor who examined Ms. Khoury specifically found that she did not need mental health services or follow-up treatment. [**Exhibit Z**].

93. As noted on the form, Ms. Khoury did not even speak to the assistant who wrote "acute psychosis." The doctor who examined Ms. Khoury immediately release her without providing Ms. Khoury with any medication or treatment. The doctor also did not require that Ms. Khoury seek any other treatment. [**Exhibit Z**]. Also, it is astonishing that Officer Williams would intentionally mislead the Court with incomplete medical records. [**Exhibit Z**].

94. As noted on the form, Ms. Khoury did not speak to the assistant who wrote the initial intake form. [**Exhibit Z**]. The doctor who examined Ms. Khoury did not make any of those findings. [**Exhibit Z**].

95. As noted on the form, Ms. Khoury did not speak to the assistant who wrote the initial intake form. [**Exhibit Z**]. The doctor who examined Ms. Khoury did not make any of those findings. [**Exhibit Z**].

96. As noted on the form, Ms. Khoury did not speak to the assistant who wrote the initial intake form. [**Exhibit Z**]. The doctor who examined Ms. Khoury did not make any finding of major depressive disorder with psychosis. [**Exhibit Z**].

99. Ms. Khoury cannot afford any more treatments and the rehabilitation will not "front" any more services. [**Exhibit Z**].

## Ms. Khoury's Additional Facts

100. While standing across the street, Ms. Khoury again asked Officer Williams for his name. As seen on the video, Ms. Khoury stated, "Hey *officer,* can you tell me your name please." Officer Williams refused to answer. [**Exhibit BB**].

102. Officer Williams claims that, "As I stumbled, Ms. Khoury [did] a flop on the ground, just boom." His claim is nonsense. Neither video supports this tale. [**Exhibit C** at 34:3-20].

103. Officer Williams rudely stated, "Because I can open any of the gates anytime."

104. As seen on the video, Ms. Khoury recorded Officer Williams's license plate while standing approximately 30-40 feet away him. Ms. Khoury was not doing anything remotely illegal or threatening. [**Exhibit BB**].

Respectfully submitted,

Hilton Napoleon, II, Esq., FBN 17593
RASCO KLOCK PEREZ & NIETO, P.L.
2555 Ponce de Leon Blvd., Suite 600
Coral Gables, Florida 33134
Telephone: 305.476.7100
Facsimile: 305.675.0850
hnapoleon@rascoklock.com

*Counsel for the Plaintiff, Susan Khoury*

By: */s/ Hilton Napoleon, II*
      Hilton Napoleon, II

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on January 19, 2018, that a true and correct copy of the foregoing Motion was served electronically via the Court's CM/ECG system upon the parties who are currently on the list to receive e-mail notice/service for this case and on the parties identified in the service list below.

By: */s/ Hilton Napoleon, II*
Hilton Napoleon, II