**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 16-CV-20680-RNS

SUSAN KHOURY,

        Plaintiff,

v.

THE MIAMI-DADE COUNTY
SCHOOL BOARD, a political
subdivision of the State of Florida and
GREGORY WILLIAMS, a resident of the
State of Florida,

        Defendants.

_____/

**RESPONSE IN OPPOSITION TO THE MIAMI-DADE COUNTY**
**SCHOOL BOARD'S  MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Susan Khoury ("Ms. Khoury"), responds to the Miami-Dade County School Board's (the "School Board") Summary Judgment Motion filed on November 29, 2017, [D.E. 149], and says:

**PRELIMINARY STATEMENT**

"*Facts do not cease to exist because they are ignored.*"

*Aldous Huxley*, Complete Essays 2, 1926-29

To support its argument for summary judgment, the School Board has to ignore approximately 25 depositions of its own employees, which substantiate its policy or custom of improperly "Baker Acting" people who do not qualify.  Just as the case with Officer Williams, the Court should reject the School Board's motion because it leaves out important facts.

**ARGUMENT**

I.     **SUMMARY JUDGMENT IS INAPPROPRIATE SINCE THERE ARE GENUINE ISSUES OF MATERIAL FACTS.**

Summary judgment is authorized only when the moving party demonstrates that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Factual disputes are "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Id.* at 247.

In *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970), the Supreme Court explained that "when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion." If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial.  *Clemons v. Dougherty Cnty*., 684 F.2d 1365, 1368–69 (11th Cir.1982).[1]

"Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts.  If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Clemons*, 684 F.2d at 1368–69; *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)("when conflicts arise between the facts evidenced by the parties, they must credit the nonmoving party's version.").

---

[1] The standard for summary judgment under Florida law is the same as federal law. *See Medina v. Yoder Auto Sales, Inc.,* 743 So. 2d 621 (Fla. 2d DCA 1999) (holding that summary judgment is improper if the record raises the slightest doubt that a factual issue might exist).

*Disputed Facts*

Summary Judgment is inappropriate here because the parties disagree on just about every material facts.  For instance, the School Board claims that Ms. Khoury, a 56-year-old, 5'3 woman, pushed Officer Williams, a 200-pound, 23-year Army veteran with Special Forces training, down to the ground.  Ms. Khoury testified to the complete opposite.  (KSMF at 24)[2].  She stated that she never pushed Officer Williams and that he never fell to the ground.  (KSMF at 24).  Furthermore, Ms. Khoury stated that Officer Williams grabbed her arm, twisted it behind her back, and pushed her to the ground.  (KSMF at 24, 46).  Since the video evidence shows Ms. Khoury on the ground, Officer Williams offered the following explanation: "As I stumbled, Ms. Khoury [did] a flop on the ground, just boom."  (KSMF at 125).  The jury must decide who to believe.[3]

Ms. Khoury's cell phone video also shows Officer Williams charging toward her while stating in a menacing voice, "Why are you filming me!"  (KSMF at 15).  Officer Williams testified that he told both Ms. Khoury and Ms. Zubillaga that Ms. Khoury had a right to film and take photographs of people.  (KSMF at 15).  Officer Williams' testimony conflicts with his actions on camera.  (KSMF at 15).  Although the video turns off, any reasonable jury can infer what happened.

The parties also dispute the inferences that should be drawn from the testimony of School Board employees regarding the School Board's Baker Act policy – testimony that the School Board conveniently left out of its motion for summary judgment.

Frank Zenere, the Chairperson of the Crisis Management Program for Miami-Dade County Public Schools testified that his former boss, Suzy Berrios, told him and his colleagues that they

---

[2] Ms. Khoury will refer to the Statement of Material Facts as "KSMF," followed by the paragraph.
[3] The video evidence does not support Officer Williams' claim – neither video shows him fall to the ground.

should "make it known to schools" that people should be "Baker Acted," even on occasions when it was not warranted.  (KSMF at 128).

Mr. Zenere recalled four or five occasions where a principal called the school police and requested them to respond to an incident.  (KSMF at 129).  When the school police officer arrived and believed that the intended target of the "policy" did not meet the Baker Act criteria, Ms. Berrios told Mr. Zenere to tell the officer, "Make it happen" or she "would call the Chief of Police to make it happen."  (KSMF at 129).   And, Mr. Zenere knew she was not fooling because he personally observed Ms. Berrios follow up on her threat and call the Chief of Police directly on at least two occasions.  (KSMF at 129).  Mr. Zenere followed up on these incidents and learned that the officers did in fact Baker Act the children, even though they were not initially inclined to do so.  (KSMF at 129).

Detective Steven Hadley testified that Chief Hurley pressured officers into Baker Acting people because it accommodated the desire to "reduce crime statistics."  (KSMF at 130).  Although Detective Hadley supposedly cannot remember speaking to any officer in particular, on May 7, 2012, he wrote a letter to Jennifer Pritt, the Program Director for the Florida Department of Law Enforcement Professional Compliance Bureau, stating that he wanted to "cure a cancer" in the police department.  (KSMF at 130).  In his letter, Detective Hadley stated that, "[he] firmly believes that the crime statistics in [his] department are being manipulated to show a reduction in crime. The Baker Act Statute is being used to lower crime statistics of juvenile offenders."  [(KSMF at 130).  Detective Hadley also testified that Chief Hurley contacted him directly and told him to stop

arresting so many Black juveniles.  (KSMF at 130).  Detective Hadley requested whistle-blower protection from the FDLE after he wrote his letter.[4]  (KSMF at 130).

In 2012, Officer Nannette Badger, Chief Hurley's administrative assistant, received telephone calls from officers who were unhappy with Suzy Berrios interfering with their decision to Baker Act people.  (KSMF at 131).  Officer Badger specifically testified that officers felt pressured to Baker Act people who did not meet the criteria.  (KSMF at 131).  She relayed those calls to Chief Hurley, but never spoke to him about it because of his constant threats on her job.  (KSMF at 131).

Instead, on or about May 11, 2012, Officer Badger contacted Commander Deanna Fox-Williams. (KSMF at 132).  Officer Badger told Commander Fox-Williams that she noticed a direct correlation between the reduction in arrests and the increase in Baker Act proceedings.  (KSMF at 132).  Those facts, coupled with the calls that she received and the Chief's recent attendance at a seminar to reduce crime, caused Officer Badger to become very concerned.  (KSMF at 132).

That same day, May 11, 2012, Commander Deanna Fox-Williams emailed Jennifer Pritt from the FDLE and informed her that Officer Badger has "specific and verifiable information" regarding Chief Hurley's misuse of the Baker Act Statute to manipulate crime statistics.  (KSMF at 133).  Commander Fox-Williams told Jennifer Pritt that Officer Badger would be willing to provide a statement.   (KSMF at 133).

---

[4] On May 9, 2012, Detective Gylmer Ochoa, who sits right next to Detective Hadley, also wrote a complaint to Jennifer Pritt complaining about Chief Hurley, most of which were unrelated to the Baker Act Statute.  However, Detective Ochoa specifically stated that he received Ms. Pritt's name from Detective Hadley.  This is relevant because many of the complaining officers claim that they did not speak to anyone else.  However, all of them managed to send their complaint letters to the same person at the FDLE, *i.e.* Jennifer Pritt.  Detective Ochoa's letter is relevant because he admits to speaking to Detective Hadley.

In the School Board's motion for summary judgment, it pretends that this testimony does not exist. However, viewed in the light most favorable to Ms. Khoury, a reasonable jury could find that the School Board established an actual "policy" of Baker Acting people who do not qualify, and therefore, summary judgment is inappropriate.

Not surprisingly, the School Board also left out testimony from its non-law-enforcement employees, which establish a "custom or practice" of Baker Acting people who do not qualify. The following are examples:

### *Deposition of Alonzo Henley*

On March 1, 2013, Alonzo Henley worked as a security monitor at Brownsville Middle School. According to the Baker Act report, a female juvenile student threw a shoe at Mr. Henley, cursed at him in the cafeteria, and charged at him. The report also states that Mr. Henley had to restrain the student to calm her down. (KSMF at 136). But, Mr. Henley testified that those facts were false – that the student had not thrown a shoe at him – that he would have remembered something like that. (KSMF at 136). When asked: "What did you see which justified this young lady being placed in a mental health institution?" Mr. Henley stated, "I did not see anything to justify it." (KSMF at 136). According to Mr. Henley, the young lady did not physically hit him or have any type of weapons. [(KSMF at 136).[5] Additionally, Mr. Henley did not hear the young lady say that she was going to harm herself or anyone else. (KSMF at 136). Nevertheless, the School Board officer transported her to a mental institution for an involuntary Baker Act.

### *Deposition of Anthony Tunson*

On April 29, 2013, Anthony Tunson worked as a security monitor at Carol City Middle

---

[5] Mr. Henley later stated that the young lady pushed him, but did not do anything else. (KSMF at 136).

School.  (KSMF at 137).  According to the Baker Act incident report, Mr. Tunson restrained a student for attempting to assault a teacher.  (KSMF at 137).  The report concludes that the student could not control his actions and posed a danger to others around him.  (KSMF at 137).  The responding police officer transported the student to Citrus Mental Health Center for an involuntary mental health evaluation.  (KSMF at 137).

Mr. Tunson testified that he prevented a student's attempt to "get at" a teacher.[6]  (KSMF at 138).  However, a counter created a barrier between the student and teacher.  (KSMF at 139).  The student never walked around to the other side of the counter where the teacher was standing.  (KSMF at 137).  The teacher never responded to the student, he simply reported the student's action to the principal.  (KSMF at 138).  The student did not have any knives, forks, bats, or weapons.  (KSMF at 138).  The student did not attempt to attack Mr. Tunson or anyone else.  (KSMF at 138).  No other students were in the office when this incident occurred.  (KSMF at 138).  Ms. Tunson believes that the principal at the time called the police because she did not want to deal with it.  (KSMF at 138).

Mr. Tunson believes that, had another principal been present, he or she would have resolved the issue without calling the police.  (KSMF at 139).  According to Mr. Tunson, although the student was upset, he was "not crazy" and is very "smart."  (KSMF at 139).  Mr. Tunson did not believe that the student was going through a mental crisis or had a mental illness.  (KSMF at 139).

---

[6] Mr. Tunson testified that he sat on the student to prevent an altercation.  Mr. Tunson is approximately 6'5" and 350 pounds.  (KSMF at 138).  The student was approximately 5'4" and 120 pounds at the time. (KSMF at 138).  According to Mr. Tunson, the assistant principal told him to sit on the student.  (KSMF at 138).

***Depositions of Reginald Lee and William Smith***

Mr. Reginald Lee and Mr. William Smith, the Principal and Assistant Principal of Miami Norland Senior High (respectively), testified about a Baker Act incident that occurred on April 20, 2016. According to the Baker Act report, a juvenile was involved in a physical altercation with two students and, according to the officer, the juvenile allegedly told both Mr. Lee and Mr. Smith that he was going to "kill those two mother-fuckers with a gun." (KSMF at 140). Neither Mr. Lee nor Mr. Smith recalled this student ever making such a comment at all. (KSMF at 140). In fact, both administrators noted that they would remember if that particular student made such a statement because they know him. (KSMF at 140). Nevertheless, the School Board Baker Acted the student. (KSMF at 140).

***Deposition of Richard Samuels***

According to the Baker Act incident report, Mr. Samuels is a security monitor at Miami Beach Senior High School and stopped a student on April 13, 2016 inside of the cafeteria for being out of area. According to the report, Mr. Samuel searched the student and discovered a pocket knife in the student's pocket. (KSMF at 141). However, in his deposition, when asked if he remembered this incident, Mr. Samuels stated, "I can't recall none of this." (KSMF at 141). Mr. Samuels specifically stated, "I can't recall finding any knife." (KSMF at 141). Mr. Samuels emphasized that he has never searched a kid before in his 26 years at Miami Beach Senior High because "we're not allowed to search kids." (KSMF at 141).

***Deposition of James Head***

James Head, a security monitor at Mandarin Lakes K-8 Academy, testified regarding a Baker Act incident that occurred on April 1, 2016. According to the incident report, a juvenile struck Mr. Head in the face after he attempted to diffuse an argument between the juvenile and his

sister.  (KSMF at 142).  The juvenile began arguing with his sister because she told their classmates that their father was domestically abusing their mother.  (KSMF at 142).  Mr. Head believed that the juvenile was simply upset with his sister for talking about family matters. (KSMF at 142). When asked whether the juvenile understood what was going on, Mr. Head stated, "I think he understood exactly what was going on." (KSMF at 142).  According to Mr. Head, the juvenile was "in his right state of mind." (KSMF at 142).  According to Mr. Head, he did not see any evidence that the juvenile had a mental illness. (KSMF at 142).  Nevertheless, the School Board police officer Baker Acted the juvenile anyway.  (KSMF at 142).

### *Depositions of Grady Hepburn*

Mr. Grady Hepburn, the head custodian at Orchard Villas Elementary, testified regarding a Baker Act incident that occurred on April 6, 2016. According to the incident report, a student began pushing other students in line in the cafeteria before running around and yelling at staff. (KSMF at 143).  Although the Baker Act report describes the incident as a "battery involving students," Mr. Hepburn stated that, in reality, he witnessed a verbal altercation between two students.  (KSMF at 143).  Mr. Hepburn testified that the juvenile did not attempt to harm: (1) the security guard who separated the students; (2) the principal who responded to the incident; or (3) any other staff, any other student, or himself.  (KSMF at 143).  Furthermore, contrary to the allegations in the incident report, Mr. Hepburn did not hear the student make any statements about depression, not caring about his life, and not wanting to live anymore. (KSMF at 143).

### *Deposition of Kristan Belfield*

Kristan Belfield, a teacher at Hialeah Gardens High School, testified regarding a Baker Act incident that occurred on April 20, 2016. According to the Baker Act incident report, a female student was caught smoking tobacco products in the school restroom.  (KSMF at 144).  Although

Ms. Belfield was able to verify that the student was brought to the office for smoking in the restroom, she had a sudden case of amnesia regarding any other details.  (KSMF at 144).  Ms. Belfield did admit, however, that the student did not attempt to cut herself, harm herself in any way, or attack another student. (KSMF at 144).  Ms. Belfield "did not recall" ever hearing the student threaten any students, staff, or police officers. (KSMF at 144).  Nevertheless, a police officer Baker Acted the student.  (KSMF at 144).

The School Board claims that these past incidents are "irrelevant."  Ms. Khoury obviously disagrees and believes that this testimony shows a widespread practice of constitutional violations. Since the parties disagree about the inferences that should be drawn from the abovementioned deposition testimony, summary judgment is inappropriate.

## II.        THE EVIDENCE SUPPORTS MS. KHOURY'S *MONELL* CLAIM

The School Board moved for summary judgment on Ms. Khoury's § 1983 *Monell* claim. According to the School Board, Ms. Khoury failed to prove that it has a policy, custom, or practice of Baker Acting people who do not qualify for that statutory treatment.  The School Board is flat-out wrong.   Section 1983 provides:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress.

Municipalities and other local government entities are subject to liability under section 1983 if one of its agents injures an individual while acting pursuant to a municipal policy. *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  A municipal policy can be established by showing either a "policy" promulgated by its policymakers, or a "custom or practice." *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003).  A "policy" is an official decision by

a municipal policymaker.  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  To establish a *Monell* violation pursuant to a "policy," no evidence is needed other than a statement of the policy by the municipal corporation.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985).  In order to establish a "custom or practice," a plaintiff is required to point to past instances of similar constitutional violations.  *See Grech v. Clayton Cty., Ga.*, 335 F.3d 1326 (11th Cir. 2003); *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998); *Doe v. Miami-Dade Cty.*, 797 F. Supp. 2d 1296 (S.D. Fla. 2011)(Hoeveler, J.).  Constructive knowledge of a "custom or practice" can be imputed to a municipality, even if not formally approved.  *German v. Broward Cnty. Sheriff's Office*, 315 F. App'x 773, 776 (11th Cir. 2009).

A plaintiff can prove a *Monell* violation through circumstantial evidence and inferences because, not surprisingly,  a governmental entity will rarely formally adopt a policy permitting or encouraging constitutional violations.  *Grech v. Clayton Cty*., 335 F.3d 1326, 1329–30 (11th Cir. 2003) (en banc).  A plaintiff can also prove a *Monell* violation based on a municipality's failure to prevent known constitutional violations.  *Depew v. City of St. Mary's, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986)(A municipality's "continued failure … to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983."); see also *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) ("a persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing an unconstitutional custom that can subject the government to liability").

"Normally random acts or isolated incidents are insufficient to establish a custom or policy." *Id.*  However, "[e]ven in the absence of an express policy or custom, a local government body can be held liable 'for a single act or decision of a municipal official with final policymaking

11

authority in the area of the act or decision.'" *Cuesta v. Sch. Bd. of Miami–Dade Cnty.*, 285 F.3d 962, 968 (11th Cir. 2002) (quoting *McMillian v. Johnson,* 88 F.3d 1573, 1577).

As discussed below, the School Board violated Ms. Khoury's fourth amendment right against illegal seizures when Officer Williams detained her pursuant to: (1) the School Board's "policy" of Baker Acting people who do not qualify; and (2) the School Board's "custom or practice" of Baker Acting people who do not qualify.[7]

In order to hold the School Board liable, Ms. Khoury must demonstrate: "(1) that her constitutional rights were violated; (2) that the municipality had a policy, custom or practice that constituted a deliberate indifference to that constitutional right; and (3) that the policy, custom or practice caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204 (1989)).

### i.      Ms. Khoury's constitutional rights were violated.

A fourth amendment seizure occurs where there is a governmental termination of freedom of movement through means intentionally applied.  *Scott v. Harris*, 550 U.S. 372 (2007).  For a seizure to occur, a person must not be free to disregard the police and go about his business.  *West v. Davis*, 767 F.3d 1063, 1069 (11th Cir. 2014).  "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner,* 471 U.S. 1 (1985).

In section 1983 cases, the "reasonableness" of a seizure is determined by the presence or absence of probable cause.  *California v. Hodari D.,* 499 U.S. 621, 624 (1991).  "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their

---

[7] Ms. Khoury withdraws her claim that the School Board failed to train its officers.  The School Board did provide training for its officers.  However, the Chief told them to ignore their training and Baker Act people anyway.  While Ms. Khoury does not condone such appalling behavior, she must stipulate that said behavior does not amounts to a "failure to train" under the current state of the law.

knowledge sufficient to warrant a reasonable belief that the suspect has committed or was committing a crime." *United States v. Floyd,* 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (quotation marks omitted). Whether an officer has probable cause to arrest is based on the totality of the circumstances. *Maryland v. Pringle,* 540 U.S. 366, 370 (2003).

Viewing the evidence in the light most favorable to Ms. Khoury, Officer Williams detained her without probable cause. For the last five years, the School Board has allowed Glades Baseball and Softball League ("GBSL") to overtake Glades Middle School and the area surrounding Ms. Khoury's home by conducting baseball games literally *every night* of the week. (KSMF at 10). GBSL participants and observers have destroyed residents' lawns, left trash in the yards, knocked down mailboxes, and run over plants. Ms. Khoury and approximately 60 of her neighbors begged the School Board and its police department for help. Ms. Khoury even appeared twice before the School Board to express her concerns. The School Board promised change, but it never delivered.[8]

On January 29, 2015, Ms. Khoury noticed two vehicles improperly parked in her neighborhood. One of the gates to the field was unlocked. (KSMF at 2). Ms. Khoury took a photograph with her phone to document to the School Board that the parking/gate problem had not been resolved as the School Board promised her. (KSMF at 2). Doris Zubillaga confronted Ms. Khoury because she thought that Ms. Khoury took a photograph of the license plate of her improperly parked car. (KSMF at 2). Ms. Zubillaga confronted Ms. Khoury about taking photographs and called the police. (KSMF at 2).

---

[8] The School Board promised to lock the gate adjacent to the field to force participants/observers to park in the school's parking lot instead of the street.

Officer Williams arrived approximately 20 minutes later.  Officer Williams spoke to Ms. Zubillaga first and then unlocked one of the gates to the field, which Ms. Khoury found to be odd.[9] (KSMF at 10).  Officer Williams then walked across the street[10] to where Ms. Khoury was standing and lectured her about taking photographs.  See *Exhibit T*.  Officer Williams claimed that cars next to the field were parked legally, even though one of the cars was illegally facing the opposite way of traffic.  (KSMF at 12).  Ms. Khoury, a former law enforcement officer herself, is completely surprised at Officer Williams' conclusion. Ms. Khoury asked Officer Williams, "Why did you open the gate?" as she attempted to explain that the School Board agreed to keep it locked.  (KSMF at 12).  Officer Williams rudely stated, "Because I can open any of the gates anytime."  Ms. Khoury asked Officer Williams for his name, but he refused to provide it.  (KSMF at 12).  Officer Williams then walked back across the street and spoke to Ms. Zubillaga.  (KSMF at 12).  Ms. Khoury became skeptical of Officer Williams' intentions and turned on her cell phone video recorder to document her interactions with him.[11]  While standing across the street, Ms. Khoury again asked Officer Williams for his name.  As seen on the video, Ms. Khoury stated, "Hey *officer*, can you tell me your name please."  (KSMF at 124).  Officer Williams refused to answer. (KSMF at 124).

---

[9] Officer Williams claims that he was unaware that the School Board promised to lock the gates. However, a reasonable jury could disregard his contention because he immediately opened the gates and chastised Ms. Khoury for her actions.

[10] The School Board claims that Ms. Khoury refused to speak to Officer Williams.  However, Ms. Khoury simply asked Officer Williams to speak to her across the street because Ms. Zubillaga was standing in close proximate to his car, and that she did not want to get into another confrontation with her.  Ms. Khoury communicated this information to Officer Williams, which is why he walked over to her.

[11] Ms. Khoury was skeptical because: (1) Ms. Zubillaga's car was clearly parked illegally; (2) Ms. Khoury had previously filed an internal affairs complaint against a high ranking School Board police captain regarding his actions after she took a picture of his vehicle; (3) the Metro-Dade Police Department always responded to the scene when Ms. Khoury complained about improperly parked cars or when people complained about her taking pictures; and (4) Officer Williams immediately became hostile toward Ms. Khoury and refused to provide his name.

Ms. Khoury then walked across the street and attempted to record the license plate to Officer Williams' police cruiser, which is a common way to identify a police officer who refuses to provide his name.  (KSMF at 19).  As seen on the video, Ms. Khoury recorded Officer Williams' license plate while standing approximately 30-40 feet away him.  (KSMF at 20).  Ms. Khoury was not doing anything remotely illegal or threatening.  (KSMF at 27).  Nevertheless, when Officer Williams noticed Ms. Khoury recording him and his vehicle, he stated in a very menacing voice, "Why are you recording me!" (KSMF at 14).  Officer Williams violently charged toward Ms. Khoury, grabbed her left arm, and twisted it behind her back.  (KSMF at 14).  Ms. Khoury felt excruciating pain shoot down her arm and heard a cracking sound. Ms. Khoury, a 56 year-old, 5'3 woman, continued to scream in pain and begged Officer Williams to stop.  (KSMF at 21).  Ms. Khoury believed that Officer Williams, a former military veteran with extensive training, was on the verge of breaking her arm.  Officer Williams continued to twist Ms. Khoury's arm and then pushed her to the ground.  Ms. Khoury obviously did not feel free to leave.  At this point, no reasonable police officer could believe that probable cause existed to detain Ms. Khoury for filming Officer Williams.

Nevertheless, Officer Williams continued his illegal conduct.  After Officer Williams pushed Ms. Khoury to the ground, he and an off-duty Homestead police officer, Victor Agosto, who was attending his son's baseball practice, handcuffed Ms. Khoury.[12]  (KSMF at 52).  Officer Williams then transported Ms. Khoury to Kendall Regional Hospital for an involuntary mental health examination under Florida's Baker Act, Fla. Stat. 394.46.[13]  (KSMF at 55,58).

---

[12] Doris Zubillaga's daughter began recording the incident at this point.  Victor Agosto testified that he did not see how the incident started and was simply assisting one of his fellow officers with taking someone into custody.

[13] Florida's Baker Act, Fla. Stat. 394.463, provides:

Here no reasonable officer could have believed that Ms. Khoury: (1) had a mental illness; (2) was unable to determine for herself that an examination was necessary; and (3) was a danger to herself or other based on her recent behavior.   (KSMF at 68).   Therefore, Officer Williams violated Ms. Khoury's fourth amendment right against illegal seizures.

> **ii.      The School Board Developed a Policy, Custom, or Practice that Amounted to a Deliberate Indifference to a Citizen's Right Against Illegal Seizures.**

As stated above, a municipal policy can be establish by showing either a "policy" promulgated by municipal policymakers, or a "custom or practice." *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003).  The evidence in this case establishes that the School Board had a "policy" and a "custom or practice" of Baker Acting people who should not have been.

A "policy" includes a decision by a municipal policymaker.  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).   "To establish a policy under *Monell,* no evidence is needed other than a statement of the policy by the municipal corporation."  *City of Oklahoma City v. Tuttle*, 471 U.S.

---

(1) A [police officer may transport a person] to a receiving facility for involuntary examination if there is reason to believe that the person ***has a mental illness*** and because of his or her mental illness:

  (a)   1.   The person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination; or
        2.   The person is unable to determine for himself or herself whether examination is necessary; ***and***

  (b)   1.   Without care or treatment, the person is likely to suffer from neglect or refuse to care for himself or herself; such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; or
        2.   ***There is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior***.

808, 822–23 (1985).  Since a governmental entity will rarely formally adopt a policy permitting or

encouraging constitutional violations, a plaintiff can prove a *Monell* violation through

circumstantial evidence and inferences.  *Grech v. Clayton Cty*., 335 F.3d 1326, 1329–30 (11th Cir.

2003) (en banc).

The uncontroverted evidence in this case shows that a reasonable jury could find that the

School Board developed a policy of Baker Acting people who do not qualify.[14]  As stated above,

Frank Zenere testified that his former boss, Suzy Berrios, told him and his colleagues that they

should "make it known to schools" that people should be Baker Acted, even on occasions when it

was not warranted.  The officers were instructed to "make it happen or Ms. Berrios would call the

chief of police to make it happen."  Mr. Zenere testified to incidents where the Chief "made it

happen."

Detective Steven Hadley testified that he wanted to "cure a cancer" in the police department

and "firmly believed that the Baker Act statute was being used to lower crime statistics."  Chief

Hurley told Detective Hadley to stop arresting so many Black juveniles. Officer Nannette Badger

testified that officers called her and stated that they felt pressured to Baker Act people who did not

meet the criteria.  Commander Deanna Fox-Williams told Jennifer Pritt that Officer Badger has

"specific and verifiable information" regarding Chief Hurley's misuse of the Baker Act statute.

When the news broke, Chief Kitchell conducted a shoddy investigation, at best, and

determined three days later that "there is no validity" to the employee's allegations that the School

Board improperly Baker Acted people.  To this day, neither Chief Kitchell, Chief Moffett, nor

---

[14] The School Board's corporate representative testified that the Chief of Police is the policymaker for the School Board regarding public safety and police matters.  Chief Moffett testified to the same.  The School Board is estopped from changing its position because, in early motions, it successful argued, to Ms. Khoury's detriment, that the Chief of Policy is the policymaker for the police department.

anyone from the School Board spoke to Officers Badger, Hadley, Ochoa, Fox-Williams or Frank Zenere about their complaints, or any of the students, adults, teachers, counselors, or staff members who witnessed the Baker Act incidents. Based upon this evidence, a jury could easily find that the School Board developed a policy of Baker Acting people who did not qualify, which amounted to a deliberate indifference to their constitutional rights.

Additionally, if there was any question about the School Board's policy, Chief Moffett answered it. Chief Moffett testified that he reviewed the videos and reports in this case and concluded that Officer Williams Baker Acted Ms. Khoury pursuant to the School Board's policy.

The evidence in this case also shows that the School Board has a custom or practice of Baker Acting people who do not qualify. In order to prove a "custom or practice," a plaintiff is required to point to past instances of similar constitutional violations.[15] *See Grech v. Clayton Cty., Ga.*, 335 F.3d 1326 (11th Cir. 2003); *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998); *Doe v. Miami-Dade Cty.*, 797 F. Supp. 2d 1296 (S.D. Fla. 2011)(Hoeveler, J.). As detailed above, the testimony of the non-law-enforcement School Board employees proves that the School Board had a custom or practice of Baker Acting people who do not qualify.

Although the School Board claims that Ms. Khoury's case is different from the prior Baker Act incidents because she is a 57-year-old woman who was Baker Acted after school hours in her own neighborhood, the "prior incidents" need not be "identical." See *Rivas v. Figueroa,* No. 11–

---

[15] To the extent the School Board claims that Ms. Khoury failed to present a sufficient number of past instances, the doctrine of judicial estoppel negates the School Board's argument. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988) ("the equitable concept of judicial estoppel precludes a party from assuming a position in a legal proceeding inconsistent with one previously asserted"). Here, Ms. Khoury moved on several occasions to depose additional witnesses. The School Board opposed Ms. Khoury's efforts every step of the way. The magistrate judge limited the number of depositions and this Court upheld the magistrate's ruling. Therefore, the doctrine of judicial estoppel prevents the School Board from contesting the number of "prior violations" that Ms. Khoury presents.

cv–23195, 2012 WL 1378161 at *3 (S.D. Fla. Apr. 20, 2012)(Scola, J.); *Fisher v. Miami-Dade County*, 114 F. Supp. 3d 1247 (S.D. Fla. 2015)(Huck, J./Otazo-Reyes, M.J.); [16] *Vasquez v. City of Miami Beach*, 895 F. Supp. 2d 1275, 1278 (S.D. Fla. 2012)(Martinez, J.).  In *Rivas*, this Court stated:

> Plaintiffs claim that they were unjustly targeted by Miami Beach police officers because they were pretending to video record the officers. They further claim that they were wrongly arrested and severely beaten by the officers because the officers thought they had recorded them. While the multiple examples of prior incidences alleged by the Plaintiffs are not precisely identical to the facts in this case, they are similar enough to make out a claim that Miami Beach has adopted a widespread practice of permitting its officers to use excessive force.

*See* 2012 WL 1378161 at *3.  This Court found that *Rivas* passed the "substantially similar" test, even though no other "prior incident" involved a citizen who recorded a police officer – which is eerily similar to this case.

Here, the prior instances involved School Board officers who *improperly seized individuals and subjected them to Florida's Baker Act, even though they did not qualify.*  These incidents are substantially similar because: (1) a School Board officer responded to school grounds; (2) the call was in reference to a verbal or physical confrontation; (3) the officer intervened and interviewed witnesses; and (4) the officer ultimate Baker Acted a person who did not meet the criteria.  These facts are sufficiently similar to Ms. Khoury's case.

### iii.    The "Policy" Or "Custom Or Practice" Caused The Violation

"A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation."  *Zatler v. Wainwright,* 802 F.2d 397,

---

[16] In *Fisher,* Judge Huck ruled that Miami-Dade County's neglect of a Plaintiff's low heart rate and kidney infection was "substantially similar" to the County's prior neglect of inmates who had dissimilar medical conditions, such as MRSA infection, diabetes, and insulin treatment.

401 (11th Cir.1986).  "Recovery of damages is limited to those injuries proved to be caused by the defendants."  *Troupe v. Sarasota Cty., Fla.*, 419 F.3d 1160, 1165 (11th Cir. 2005).

Chief Moffett testified that Officer Williams detained Ms. Khoury pursuant to the School Board's Baker Act policy.  Therefore, based upon his testimony alone, causation is established. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985). (To establish causation under *Monell,* "no evidence is needed other than a statement of the policy by the municipal corporation."); see also *City of Springfield, Mass. v. Kibbe*, 480 U.S. 257, 267 (1987); *Cuesta v. Sch. Bd. of Miami–Dade Cnty.*, 285 F.3d 962, 968 (11th Cir. 2002) (quoting *McMillian v. Johnson,* 88 F.3d 1573, 1577)("[e]ven in the absence of an express policy or custom, a local government body can be held liable 'for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision.'").

## CONCLUSION

Based on the foregoing, Plaintiff, Susan Khoury, respectfully requests that this Court enter an Order denying the Defendant's Motion for Summary Judgment.

**Dated:** January 19, 2018.

Respectfully submitted,

Hilton Napoleon, II, Esq. FBN 17593
RASCO KLOCK PEREZ NIETO
2555 Ponce De Leon Blvd., Suite 600
Coral Gables, Florida 33134
Telephone: 305.476.7100
Facsimile: 305.476.7102

By: */s/ Hilton Napoleon, II*
        Hilton Napoleon, II

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 19, 2018, I have filed the foregoing document with the Clerk of the Court using the CM/ECF system and that it is being served this day on all counsels of the parties of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those parties who are not authorized to receive electronically Notices of Electronic Filing.

By: _/s/ Hilton Napoleon, II_____
    Hilton Napoleon, II