United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Susan Khoury, Plaintiff | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 16-20680-Civ-Scola |
| Miami–Dade County School Board | ) |
| and Gregory Williams, Defendants. | ) |

### <u>Order Granting the Defendants' Motions for Summary Judgment</u>

Plaintiff Susan Khoury lives in a home near the Glades Middle School baseball field. For years she has complained about cars she believed were parking illegally around the field where the Glades Baseball and Softball league holds practices and games in the evenings. The police have received many complaints over the years from parents of the ball players that Khoury has videotaped and photographed their children and that she has had several aggressive confrontations with the parents. On January 29, 2015, Officer Gregory Williams, a Miami-Dade School Police Officer, was called to the area of the ball field by yet another parent who felt threatened by Khoury. After conducting an investigation, Williams determined that Khoury was a danger to herself or others and detained her pursuant to Florida's Baker Act.[1] Khoury sued the Miami-Dade School Board ("School Board") and Officer Williams

---

[1] The Florida Mental Health Act of 1971, also known as the Baker Act, allows a law enforcement officer to detain a person for an involuntary mental health examinations if "there is reason to believe that the person has a mental illness and because of his or her mental illness:

> (a) 1. The person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination; or
> 2. The person is unable to determine for himself or herself whether examination is necessary; and
> (b) 1. Without care or treatment, the person is likely to suffer from neglect or refuse to care for himself or herself; such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; or
> 2. There is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior.

Fla. Stat. § 394.463(1)(2006).

(collectively "Defendants") because she believed that she was wrongfully detained and the School Board had a policy, custom, or practice of detaining citizens who did not qualify under the Baker Act. The Defendants now move for summary judgment. For the reasons that follow, the Defendants' motions (**ECF No. 147, 148**) are **granted**.

## 1. Background

On February 24, 2016, Khoury filed a seven-count complaint, which included federal claims and a state law claim, against the School Board and Officer Williams. (Compl., ECF No. 1.) On March 21, 2016, the Defendants moved to dismiss the federal claims in the complaint. (Mot., ECF No. 8.) The Court granted the Defendants' motion to dismiss as to Count II, which was a failure-to-train claim under 42 U.S.C. § 1983 against the School Board based on the First Amendment, but denied the motion on all other grounds. (ECF No. 19.) Relevant here, in the Plaintiff's response to the School Board's motion for summary judgment, she withdrew her remaining failure-to-train claim against the School Board. (ECF No. 158 at 12, n.7.) As a result, the Plaintiff's remaining claims against the School Board are: a § 1983 claim against the School Board for having a policy, custom, or practice of improperly subjecting citizens to the Baker Act in violation of the Fourth Amendment in an effort to reduce crime statistics (Compl. at ¶¶ 95–103, ECF No. 1); three § 1983 claims against Officer Williams, in which the Plaintiff alleges a Fourth Amendment violation for false arrest and imprisonment (*id.* at ¶¶ 104–109), a Fourth Amendment violation for excessive force (*id.* at ¶¶ 110–116), and a First Amendment violation for retaliation (*id.* at ¶¶ 117–125); and, a state law claim for false arrest and false imprisonment against the School Board and Officer Williams. (*Id.* at ¶¶ 126–132.)

## A. Events of January 29, 2015

The crux of the Plaintiff's claims stems from events that occurred not too far from her home. The Plaintiff lives near Glades Middle School, where the Glades Baseball and Softball League (GBSL) practices and conducts their games. (Pl. Dep., ECF No. 151-1 at 78:1–79:8). By way of background, the use of the field became a nuisance to the Plaintiff and several of her neighbors because of the noise and lights that emanated from the field on a regular basis. (*Id.* at 245:24–247:21). Beginning in 2011, the Plaintiff presented various complaints to the School Board, including complaints about illegally parked cars and the field gates being left open. (*Id.* at 247:11–23; 253:3–24.) When the issues continued, the Plaintiff decided to start taking photos or filming cars

that were illegally parked near the field. (*Id.* at 156:5–23.) On January 14, 2015, she had a discussion with a School Board official about the fact that the field gates were open despite the fact that they were supposed to be locked. (*Id.* at 278:14–24.)

On the night of January 29, 2015, the Plaintiff sought to take a photograph of an open gate next to two illegally parked cars. (*Id.* at 278:2–16; Pl.'s Aff. ¶ 5, ECF No. 160-20.) Doris Zubilliaga, a mother of one of the GBSL players, was in one of the cars and believed that the Plaintiff was filming her. (Zubilliaga Aff. at ¶ 7–8, ECF No. 151-5.) Ms. Zubilliaga became upset, which led to a confrontation between the two women. (*Id.* at ¶ 9.) Ms. Zubilliaga proceeded to call the police. (*Id.* at ¶ 10.)

About 20 minutes later, Officer Williams arrived on the scene. Officer Williams spoke first with Ms. Zubilliaga, who told him that she was sitting in her car when the Plaintiff came up to her and started filming her, and that she asked her multiple times to refrain from doing so to no avail. (Zubilliaga Aff. at ¶ 10, ECF No. 151-5.) Ms. Zubilliaga also told Officer Williams that the Plaintiff was taking photos of "the kids, her kids and filming her and . . . [that the Plaintiff] got combative and aggressive with her when she asked her not to do it." (Williams Dep., ECF No. 151-6 at 25:2–8.)

After speaking with Ms. Zubilliaga, who was across the street from the Plaintiff at the time, Officer Williams opened a locked gate leading to the baseball field. (Pl.'s Resp. to School Board's Stmt. of Material Facts at ¶ 10, ECF No. 159.) Officer Williams then asked the Plaintiff to come speak to him by his car, which the Plaintiff refused to do because she wanted to avoid a confrontation with Ms. Zubilliaga. Officer Williams then approached the Plaintiff to speak to her.[2] (Pl.'s Dep., ECF No. 151-1 at 295:23–297:14.) The Plaintiff tried to explain her side of the story to Officer Williams and also asked him why he had opened the gate. (*Id.* at 291:23–292:20.) She claims that he replied, "[b]ecause I can open any of the gates anytime." (Pl.'s Aff. at ¶ 21, ECF No. 160-20.) Officer Williams claims that they also discussed whether the cars were illegally parked, and that he told the Plaintiff that the cars were not illegally parked but she did not believe him. (Williams's Dep., ECF No. 151-6 at 29:1–6.) The Plaintiff disputes that they had this discussion but affirmatively contends Ms. Zubilliaga's car was illegally parked. (Pl.'s Resp. to William's

---

[2] The Defendants claims that Officer Williams asked the Plaintiff to speak to him after he spoke with Ms. Zubilliaga, and that once the Plaintiff refused to speak with him, he opened the locked gate. (School Board's Stmt. of Material Facts at ¶ 10, ECF No. 149; Williams's Stmt. of Material Facts at ¶ 29, ECF No. 150.) At the summary judgment stage, we must construe the facts in favor of the Plaintiff as the non-moving party, *Feliciano v. Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013), so the Court presents the Plaintiff's version of the facts as stated in the text.

Stmt. at ¶ 31.) When Officer Williams proceeded to walk away from the Plaintiff, she asked him multiple times for his name and Officer Williams did not respond. (*Id.* at 297:12–19.)

Officer Williams then went back across the street to speak with Ms. Zubilliaga and other residents. Ms. Zubilliaga asked him to report the incident out of fear that the situation could escalate if not properly documented. (Zubilliaga Aff. at ¶ 12, ECF No. 151-5.) Other residents complained to Officer Williams about Plaintiff Khoury, and told him that she would often take photos and videotape their children at the field. (Williams Dep., ECF No. 151-6 at 79:25–80:10). One resident told Officer Williams that when the residents would ask her to stop, she would "get in their face" and several residents said they were "afraid of her." (*Id.* at 81:1–4.)

While Officer Williams was across the street, the Plaintiff proceeded to record a video. (Plaintiff's Video, ECF No. 142.) She then said: "Hey officer! Can you tell me your name please?" Officer Williams did not respond. (*Id.*) She then approached Officer Williams's vehicle, beside which Officer Williams was standing with Ms. Zubilliaga and others. (*Id.*) Officer Williams, while walking towards the Plaintiff, asked: "Why are you filming me?" (*Id.*) The parties dispute what happened next.

Plaintiff claims that at this point, Officer Williams charged towards her. (Pl.'s Aff. at ¶ 26, ECF No. 161-20.) Officer Williams then twisted her left arm behind her back in an attempt to arrest her. (*Id.* at ¶ 28.) Plaintiff claims that she "felt excruciating pain and heard a crackling sound." (*Id.*) There is no dispute that Plaintiff resisted Officer Williams's attempts to arrest her. (Pl.'s Dep., ECF No. 160-2 at 14:6–16:24.)

Officer Williams claims that after he asked the Plaintiff why she was filming him, she approached him, and the light from the Plaintiff's cellphone caused him to put his "arm up to block the light," at which point, the Plaintiff pushed him and he lost his footing and stumbled, causing them both to fall to the ground. (Williams Dep., ECF No. 151-6 at 34:3–20.) He claims that while he was trying to help the Plaintiff up, she said that he was attacking her. (*Id.* at 34:25–35:4). After initially getting her up, Officer Williams claims that she put her weight on him, which caused them to fall down again. (*Id.* at 35:6–11.) Plaintiff Khoury vehemently disputes Officer Williams's claim that she pushed him. (Pl.'s Resp. to William's Stmt. of Material Facts, ECF No. 159 at ¶ 43; Pl.'s Resp. to School Board's Stmt. at ¶ 23.)

An off-duty police officer, Officer Victor Agosto of the Homestead Police Department, was at the location and came over to the scene and attempted to assist Officer Williams in controlling the Plaintiff. (School Board's Stmt. at ¶ 29, ECF No. 151-4.) While Officer Williams and Officer Agosto were trying to

handcuff the Plaintiff, she called out for help multiple times, exclaimed that she had done nothing wrong, used the phrase "false arrest," and shouted out "call Metro-Dade." (Bystander's Video, ECF No. 142.) She also claims that she was shouting that the officers were hurting her. (Pl.'s Aff. ¶ 29, ECF No. 160-20.) Upon gaining control over the Plaintiff, and handcuffing her, Officer Williams detained her pursuant to the Baker Act and took her to Kendall Regional Center, where she received treatment for a dislocated elbow. (Medical Records, ECF No. 160-26.) She was then transferred to Miami Behavioral Health Center for a mental health evaluation. (*Id.*)

### B. Evidence of the School Board's Policy, Custom, or Practice

The Plaintiff asserts that in 2012, the School Board, under the leadership of then-Chief of Police Charles Hurley developed an unwritten policy of improperly detaining citizens under the Baker Act to reduce crime statistics. (School Board's Stmt. at ¶ 69, ECF No. 149.) Reports from various newspapers at the time discussed the high number of incidents in which the Baker Act was invoked. (Sample Articles, ECF No. 160-27.) However, these incidents involved the use of the Baker Act to detain *students* at the school during school hours – not an *adult neighbor* outside a ball field in the evening. Frank Zenere, the Chairperson of the Crisis Management Program for Miami-Dade County Public Schools, testified that his previous supervisor, Suzy Berrios,[3] on several occasions promoted reliance on the Baker Act when officers sought to arrest students instead. (Zenere's Dep., ECF No. 151-22 at 25:7–30:12.) Detective Steve Hadley also testified regarding a letter that was sent in 2012 in which he stated that the Baker Act was being used to manipulate crime statistics under Chief Hurley. (Hadley's Dep., ECF No. 160-7 at 45:7–46:25.) Officer Nanette Badger, who was the administrative officer to Chief Hurley, also testified that she had received phone calls regarding Ms. Berrios and she had been concerned about an increase in Baker Act incidents coupled with the reduction of arrests at the time. (Badger Dep., ECF No. 160-8, 17:11–17, 24:6–14, 31:9–34:2.) There was also evidence that Officer Badger had contacted Commander Deanna Fox-Williams with information regarding Chief Hurley's misuse of the Baker Act to manipulate crime statistics. (Email, ECF No. 160-25 at 3.)

Upon receipt of complaints made against Chief Hurley, the Florida Department of Law Enforcement conducted an inquiry, but ultimately decided that there was insufficient information to justify a criminal investigation. (FDLE Letter, ECF No. 151-14.) Miami-Dade Schools Police Department

---

[3] Ms. Berrios is also referred to in the record as "Suzy Milano-Berrios." (*See, e.g.*, ECF No. 151-22 at 22:6–9.)

conducted a second review, which was led by then-Chief of Police Gerald Kitchell. (School Board's Stmt. at ¶ 82, ECF No. 149.) Chief Kitchell found "no validity" to the allegation that Chief Hurley "reduced arrests by directing officers to initiate Baker Acts," despite not interviewing individuals who had submitted complaints, or individuals who had seen or been subject to a Baker Act arrest. (Pl.'s Resp. to School Board's Stmt. at ¶ 84, ECF No. 159.) A third review was completed after current-Chief of Police Ian Moffett became Chief of Police in May of 2013. (School Board's Stmt. at ¶ 91, ECF No. 149.) That review revealed that a significant number of Baker Act incidents had occurred before he became Chief, that they were all in compliance with the statute, and that since his appointment, the number of Baker Act incidents has dropped every year since the 2012-2013 academic year, for a total 64% reduction in Baker Act incidents from the 2012-2013 academic year to the 2015-2016 academic year. (Moffett Aff. at ¶ 7, 14, ECF No. 151-17.)

The Plaintiff cites to testimony from the School Board's non-law-enforcement employees regarding seven incidents that occurred in 2013 and 2016 to support her assertion that there is a custom or practice of relying on the Baker Act when it does not apply. The reported incidents involved: (1) a student who threw a shoe at security monitor after refusing to take her diabetes medication (Henley Dep., ECF 160-12 at 6:10–7:3); (2) a student who attempted to assault a teacher (Tunson Dep., ECF No. 160-13 at 7:22–8:8); (3) a student who had been in a physical altercation with two students and said he was going to "kill" them using a gun (Lee Dep., ECF 160-14 at 11:3–13:6); Smith Dep., ECF No. 160-15 at 9:4–20); (4) a student who was found with a knife in his pocket (Samuels Dep., ECF No. 160-16 at 6:10–24); (5) a student who struck a security monitor in the head after the security monitor attempted to diffuse an argument between the student and his sister (Head Dep., 160-17 at 7:21–10:6); (6) a student who had been in an altercation with another student and then yelled at the principal and refused to comply with the principal's demands (Hepburn Dep., ECF No. 160-18 at 9:1–7); and, (7) a student who had been caught smoking tobacco in the school bathroom (Belfield Dep., ECF No. 160-19 at 9:25-10:8).

## 2. Legal Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. In reviewing a motion for summary

judgment, the Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Feliciano*, 707 F.3d at 1247 (quoting *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1143 (11th Cir. 2007)). So, when a conflict arises between the facts presented by the parties, the Court must credit the nonmoving party's version. *Id.* The moving party bears the burden of proof to demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

### 3. Analysis

The Defendants filed separate motions for summary judgment. (ECF Nos. 147, 148.) As a result, the Court will consider each motion in turn.

### A. The School Board's Motion for Summary Judgment

According to the Plaintiff, there was no arguable probable cause to detain her under the Baker Act. The Plaintiff contends that her constitutional rights were violated because she did not qualify for detention under the Baker Act and that the School Board Police has a policy, custom, or practice of detaining citizens who do not qualify for detention to manipulate crime statistics. The School Board now moves for summary judgment on the Plaintiff's § 1983 claim against it, arguing that the Plaintiff has failed to provide evidence of such a policy, custom, or practice. (Mot., ECF No. 148.)

The School Board argues that summary judgment is warranted because the record is "devoid of any evidence" of a policy, custom, or practice of the School Board police that improperly subject citizens to the Baker Act in violation of the Fourth Amendment to lower crime statistics. The School Board claims that the Plaintiff has not met her burden of showing a persistent and widespread practice of the School Board police improperly applying the Baker Act.

First, the School Board argues that the evidence the Plaintiff offers from 2012 does not present an issue of material fact. In particular, the School Board argues that the Plaintiff's reliance on a series of newspaper articles that discuss the fact that in 2012, the Miami-Dade County schools had over 600 Baker-Act incidents does not support the Plaintiff's § 1983 claim because the percentage of incidents dropped 64% from the time those articles were published to the time of the Plaintiff's incident. (*Id.* at 11.) It also argues that the Plaintiff has failed to show that any of the incidents referenced in the articles resulted in complaints that the Baker Act had been improperly relied upon. (*Id.*) The Defendant also claims that there was "no correlation" between

the number of arrests and the number of Baker-Act incidents in 2012, and even if there was such a correlation in 2012, that was a result of the training police officers were receiving and the rise of "juveniles experiencing mental illnesses" in Florida. (*Id.* at 11–12.)

The School Board similarly takes issue with the Plaintiff's evidence from after 2012. The School Board argues that the testimony provided regarding events *prior* to the Plaintiff's encounter with Officer Williams do not support her claim because, in each case, the application of the Baker Act's protocols was warranted. (*Id.* at 12, n.8.) The School Board further argues that any evidence related to events that took place *after* the Plaintiff's incident should not be considered. (*Id.* at 12.)

The School Board further claims that the Plaintiff has been unable to point to any factually similar incidents and that her singular encounter is insufficient to prove her case. Any efforts by the Plaintiff to point to incidents on school grounds during school hours, the School Board claims, should be disregarded by the Court since they are factually distinct and the "vast majority" of those who were subject to the Baker Act protocols never made formal complaints to the School Board. (*Id.* at 13.)

In response, the Plaintiff argues that there are genuine issues of material fact that preclude summary judgment. (Resp. to School Board's Mot., ECF No. 158.) The Plaintiff asserts that the parties disagree on "just about every material fact[ ]" and dispute the inferences that can be drawn from her particular incident and the testimony of School Board employees regarding the School Board's policy of relying on the Baker Act to detain citizens. (*Id.* at 3.) The Plaintiff argues that her Fourth Amendment rights were violated because she was detained by Officer Williams without probable cause, that there is evidence of prior similar incidents of improper detentions by School Board officers, and that there is definitive testimony from current-Chief of Police Ian Moffett to support her contention that she was detained pursuant to the School Board's policy or custom. The Plaintiff cites to testimony from Mr. Zenere, Detective Hadley, and Officer Badger, to support her claim that there was pressure to employ the Baker Act even in situations where such application was unwarranted. The Plaintiff also cites to the depositions of non-police employees regarding particular incidents, which she claims establish a custom and practice of using the Baker Act protocols on undeserving individuals.

In its reply, the School Board argued that the Plaintiff relies on "seven incidents" to prove her case and that there is no evidence of a policy, custom, or practice of improper reliance on the Baker Act by the School Board police. (Reply, ECF No. 166 at 1.) The School Board argues that none of the witnesses who testified claimed that the reliance on the Baker Act was unwarranted nor

could they since they are not police officers, and that each event was distinguishable from the Plaintiff's incident because they involved students on school grounds. The School Board also attempts to specifically refute the Plaintiff's citation to Detective Hadley and Frank Zenere's testimony and argues that they testified that they were unaware of instances when officers were pressured to rely on the Baker Act. The School Board doubles-down on its rejection of Plaintiff's reliance on evidence of improper uses of the Baker Act from 2012, and cites to testimony in the record that supports its position that any improper uses were confronted and dealt with, or nonexistent, and that since 2012, there have been no formal complaints.

In *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that municipalities and local government entities can be subject to liability under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. In effect, the government entity's "policy or custom" must be the "moving force" behind the constitutional deprivation. *Cuesta v. School Bd. of Miami-Dade Cty.*, Fla., 285 F.3d 962, 967 (11th Cir 2002). A policy or custom is established by showing a "persistent and wide-spread practice" and the government's actual or constructive knowledge of that practice. *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986). "Normally random acts or isolated incidents are insufficient to establish a custom or policy." *Id.* Relatedly, "a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991). To impose liability then, a plaintiff must show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

Even if the Court were to assume that the Plaintiff's constitutional rights were violated, the Plaintiff's claim against the School Board fails because she has not presented evidence of a "persistent and widespread practice" of the School Board police violating other citizens' constitutional rights by improperly relying on the Baker Act in situations where it did not apply. Although perhaps there is evidence in the record to demonstrate that there were forces encouraging the administration of the procedures set out in the Baker Act in 2012, the Plaintiff has not pointed to evidence suggesting this practice continued beyond that period.

Despite the Plaintiff's contention that the parties disagree as to "just about every material fact[ ]," the record demonstrates that there is no dispute between the parties that since 2012, the number of incidents where officers have relied on the Baker Act has substantially declined. In fact, the Plaintiff did not contest the School Board's assertion that after Chief Hurley's departure, no complaints about the Baker Act's administration have been filed. (ECF No. 149 at ¶ 124.) The Plaintiff also did not contest that since the academic year of 2012-2013, the number of incidents where the Baker Act was invoked has dropped for each academic year through 2015-2016, and that there has been a 64% drop in the number of instances where the Baker Act was relied upon. (*Id.* at ¶¶ 100–102.) Her response was merely that "[t]hese statistics only show that there *was* a serious problem." (Pl.'s Resp., ECF No. 159 at ¶ 102 (emphasis added).)

Significantly, there is no dispute that the other incidents involved Baker Act detentions of students during school hours, not an adult neighbor during a night-time game at the ball field.

Notwithstanding this concession, the Plaintiff claims that there is evidence in the record of a policy, custom, or practice by the School Board's Police Department to invoke the Baker Act when individuals do not exhibit the required criteria. The Court disagrees. Even viewing the facts in the light most favorable to the Plaintiff, the record fails to support the conclusion that the School Board Police Department has a policy, custom, or practice of detaining people who did not qualify under the Baker Act.

For instance, the testimony of Mr. Zenere, Detective Hadley, and Officer Badger, reference events from in or around 2012, and relate in large part to qualms employees had with two individuals, Chief Hurley and Ms. Berrios, both of whom no longer work for their respective institutions and have not been employed by the School Board since around 2012 or 2013. Although these witnesses' testimony could serve to demonstrate that in 2012 there were problems with the administration of the Baker Act, this testimony is insufficient to establish a pattern of constitutional violations related to events in 2015. *See Church v. City of Huntsville*, 30 F.3d 1332, 1346 (11th Cir. 1994) (rejecting testimony from incidents that occurred at least one year prior to the preliminary injunction hearing because such testimony did not support the substantial likelihood of a pervasive practice); *Wakefield v. City of Pembroke Pines*, 269 F. App'x 936, 940 (11th Cir. 2008) (concluding that two events that were 13 months apart did not establish a custom of use of excessive force).

There is also undisputed evidence in the record that the School Board Police Department's administration of the Baker Act was investigated multiple times after allegations of improper administrations of the Baker Act surfaced in

2012, and that additional training programs were implemented. (Moffett Aff. at ¶ 10–11, ECF No. 151-17.) This evidence suggests that if there were improper applications of the Baker Act in 2012, the School Board attempted to remedy the situation, which serves as an additional basis for granting summary judgment to the School Board. *See Brown*, 923 F. 2d at 1481; *Yates v. Cobb Cty. School Dist.*, 687 F. App'x 866, 873 (11th Cir. 2017).

Beyond the evidence from 2012, the Plaintiff relies on testimony from school officials regarding incidents in 2013 and 2016. This testimony similarly fails to demonstrate that there was widespread practice of the School Board police improperly relying on the Baker Act for several reasons. First, assuming the incidents are factually similar enough to the Plaintiff's incident in 2015, the Plaintiff has failed to provide evidence that these incidents resulted in complaints or findings that the Baker Act was improperly relied upon. Without more, the evidence merely describes other examples of when the School Board police thought employing the Baker Act was warranted, which is insufficient to show a constitutional violation. *See Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998) (concluding that evidence of over 8,000 disorderly conduct arrests was insufficient to establish prior constitutional violations or false arrests because the evidence did not state the reasons for those arrests). The Plaintiff attempts to rely on school officials' testimony to support her position that these incidents are examples of inappropriate uses of the Baker Act. However, the individuals who were deposed, who ranged in position from security monitor to principal at various schools in Miami-Dade County, did not state as much nor did they testify that they were well-versed in the Baker Act, its requirements, or when it should be relied upon. In several instances, the witnesses could not even recall the incident that they were being deposed about. (*See, e.g.*, Lee Dep., ECF 160-14 at 10:3–6; Smith Dep., ECF No. 160-15, 8:5–16; Samuels, Dep. ECF No. 160-16 at 6:6–24.)

Overall, the Plaintiff has failed to demonstrate there is a genuine issue of material fact relating to her § 1983 claim against the School Board. Since the facts in the record demonstrate there was no policy, custom, or practice of improperly invoking the Baker Act at the time of this incident, the School Board is entitled to summary judgment.

### B. Officer Williams's Motion for Summary Judgment

Officer Williams moves for summary judgment on all counts against him and claims he is entitled to qualified immunity. The Plaintiff responds that there are too many factual disputes to grant Officer Williams summary judgment and that Officer Williams violated her clearly established

constitutional rights, so he is not entitled to qualified immunity. Since qualified immunity offers "complete protection for government officials sued in their individual capacities" when the official's conduct does not violate clearly established law, *see Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005), the Court turns to whether Officer Williams is entitled to qualified immunity as to each claim.

To determine whether a government official is entitled to qualified immunity, the official must first establish that he was acting within his discretionary authority at the time of the challenged conduct. *See id.* If the official can establish that he was acting in his discretionary authority, then the burden shifts to the plaintiff to show (1) that the official "violated a constitutional right"; and (2) that the "right was clearly established at the time of the incident." *Id.* Both of these elements must be satisfied, but the two-prong inquiry can be done in whatever order is deemed appropriate for the case. *May v. City of Nahunta, Ga.*, 846 F.3d 1320, 1327 (11th Cir. 2017). "A right may be clearly established for qualified immunity purposes in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (internal quotation marks and citations omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *May*, 846 F.3d at 1331 (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002)).

The parties do not dispute that Officer Williams was acting in his discretionary authority for purposes of determining whether he is entitled to qualified immunity. The parties do dispute, however, whether he violated the Plaintiff's rights and whether those rights were clearly established. At the motion to dismiss stage, the Court held that Officer Williams was not entitled to qualified immunity on all counts. At the summary judgment stage, the Court has been presented with sufficient evidence to warrant concluding that Officer Williams is entitled to qualified immunity on all of the Plaintiff's claims.

### a. False Arrest and Imprisonment Claim

Plaintiff's false arrest and imprisonment claim alleges that Officer Williams violated her Fourth Amendment rights when he detained her pursuant to the Baker Act because he did not have probable cause to detain

her. (Compl. ¶ 104–109, ECF No. 1.) Officer Williams moves for summary judgment as to this claim and argues that he is entitled to qualified immunity because he had arguable probable cause to detain the Plaintiff under the Baker Act and the Plaintiff cannot point to a materially similar case that would have put him on notice that he was violating clearly established law or show that such case law is unnecessary to prove her constitutional rights were violated. The Court holds that Officer Williams is entitled to qualified immunity and summary judgment is warranted.

Officer Williams maintains that his decision to invoke the Baker Act was based on his training and knowledge regarding the statute's requirements.[4] He contends that the totality of the circumstances led him to believe that Plaintiff Khoury needed to be detained. (Williams's Mot., ECF No. 147 at 9–10.) In particular, he points to the fact that the Plaintiff exhibited "highs and lows" and "mood swings," she could not comprehend what he had communicated to her about the parked car, she reacted negatively to him opening the field gate, she had pushed him, and that at times she did not recognize that he was a law enforcement officer, as evidence that she needed to be detained under the Baker Act. He also claims that she exhibited rapid speech and eye movement, combative behavior, and that this irrational behavior was noted by other eye witnesses. Officer Williams additionally argues that the Plaintiff cannot show that he violated clearly established law.

The Plaintiff claims that the evidence demonstrates that Officer Williams detained her under the Baker Act without probable cause and that she was arrested merely for exercising her First Amendment rights. As a result, she claims she was justified in resisting her unlawful arrest. She also argues that case law demonstrates that Officer Williams violated her clearly established First Amendment right to record an officer, or in the alternative, that Officer Williams' conduct was so egregious that case law is unnecessary to show her constitutional rights were violated.

"A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004). Further, "[w]here a police officer lacks probable cause to make an arrest, the arrestee has a claim under section 1983

---

[4] Although Officer Williams cites to the School Board's Standard Operating Procedure on the Baker Act and the behaviors it directs officers to be aware of, *see* ECF No. 151-9 at 2–3, the Court is only concerned with whether Officer Williams violated the Fourth Amendment. Nevertheless, the fact that Officer Williams claims he observed certain of the behaviors he was trained to be aware of serves as corroborating evidence that he had probable cause to detain Plaintiff Khoury.

for false imprisonment based on a detention pursuant to that arrest." *Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996).

In the context of a mental-health seizure, "the Fourth Amendment requires the officer to have probable cause to believe that the person is dangerous either to himself or to others." *May*, 846 F.3d at 1327–28; *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011). Although the Baker Act sets out its own requirements for detaining an individual, the Fourth Amendment's probable cause inquiry governs. *See May*, 846 F.3d at 1327–28; *Roberts*, 643 F.3d at 905; *Cochrane v. Harvey*, No. 4:04-cv-475-RH/WCS, 2005 WL 2176874, at *3 (N.D. Fla. Sept. 1, 2005) (discussing the standards of the Fourth Amendment and the Baker Act).

To be entitled to qualified immunity, however, an officer need not have actual probable cause. *May*, 846 F.3d at 1328. Instead, only "arguable probable cause" is necessary, which requires that the facts and circumstances to be such that the "officer reasonably could have believed probable cause existed." *Id.* (quoting *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997)). Arguable probable cause may exist where a public official makes a "good faith," "reasonable mistake" in the legitimate performance of his or her duties. *Kingsland*, 382 F.3d at 1226. But a public official who "recklessly or deliberately" violates the law is not entitled to immunity under the arguable-probable-cause doctrine. *Id.* at 1233–34. Accordingly, the Court must decide whether Officer Williams carried his burden of demonstrating, as a matter of law, that at least arguable probable cause existed to detain Plaintiff Khoury under the Baker Act.

In determining whether the Plaintiff's Fourth Amendment right was violated, we consider whether the facts—viewed in the light most favorable to Plaintiff Khoury—establish that a constitutional right has been violated. *See, e.g., May*, 846 F.3d at 1327. To do so, the Court must determine whether Officer Williams had arguable probable cause by considering the "facts and circumstances within the officer's knowledge." *See Kingsland*, 382 F.3d at 1231 n.11 (recalling that probable cause requires that the "facts and circumstances *within the officer's knowledge*, of which he or she has *reasonably trustworthy information*, would cause a *prudent* person to believe, *under the circumstances shown*, that the suspect has committed, is committing, or is about to commit an offense.") (internal quotation marks and citations omitted). Stated differently, the Court can conclude that there was arguable probable cause to detain the Plaintiff when "reasonable officers in the same circumstances and possessing the same knowledge as [Officer Willams] could have believed that probable cause existed to [detain the Plaintiff]." *Scarbrough v. Myles*, 245 F.3d

1299, 1302 (11th Cir. 2001) (quoting *Redd v. City of Enter.*, 140 F.3d 1378, 1382 (11th Cir. 1998)).

As a result, certain evidence cited by Officer Williams, such as testimony from witnesses who felt that the Plaintiff was acting combatively or aggressively on the night of the incident or who felt that the Plaintiff suffered from mental health issues before the incident, without any indication that Officer Williams was informed of such details, cannot enter the Court's calculus. The Court, however, can consider information that was relayed to Officer Williams, and other corroborating evidence that Officer Williams may have considered, before he decided to invoke the Baker Act. *See, e.g.*, *May*, 846 F.3d at 1329 (relying on evidence from emergency personnel and officer's own observations, among other factors, including fact that the officer had been dispatched following a 911 call, to determine that the officer had arguable probable cause to conduct a mental health seizure); *Roberts*, 643 F.4d at 906 (relying on the fact that the officer had been dispatched in response to a 911 call, statements made to the officer, and fact that nothing in the record suggested that the officer should have doubted those statements, to conclude that officer had arguable probable cause to conduct a mental health seizure).

Officer Williams claims that he decided to detain the Plaintiff under the Baker Act based on his interactions with her and the surrounding circumstances. Although the Plaintiff contests that she did not exhibit the behaviors Officer Williams describes and that she did not push Officer Williams, and even though the video evidence objectively indicates that she was aware that Officer Williams was a police officer, the Court concludes that reasonable officers in Officer Williams's position could have believed that probable cause existed to detain the Plaintiff. Based on the information presented to Officer Williams and supporting corroborating evidence in the record, the Court concludes that Officer Williams had arguable probable cause to believe that Plaintiff Khoury was a threat to herself or others.

First, Officer Williams arrived at the scene as a result of a 911 call and heard from multiple people that Plaintiff Khoury had exhibited concerning behaviors. Officer Williams initially heard from Ms. Zubilliaga that Plaintiff Khoury had been filming her and her kids on the field. Thereafter, he heard from other residents that it was not the first time that Plaintiff Khoury had been seen taking photos or filming near the field, and that they thought she was filming their children and had exhibited combative behavior when they asked her to stop.

Second, Officer Williams's own interactions with the Plaintiff indicated she may have needed to be evaluated. For example, Officer Williams claims that after she approached him, she pushed him. Although the Plaintiff disputes

this, there is evidence in the record from Ms. Zubilliaga, an eyewitness, to support that Plaintiff Khoury *did* push him. (Zubilliaga Aff. at ¶ 14, ECF No. 151-5.) Even if the Court were to ignore this event, Officer Williams perceived Plaintiff Khoury to be exhibiting mood swings and odd behavior when he spoke to her when he first arrived on the scene and when she claimed he was attacking her. (*See, e.g.*, Williams Dep., ECF No. 151-6 at 49:19–25.) Although Plaintiff claims that Officer Williams was attacking her and cites to video evidence in support (Pl.'s Resp. to Williams's Stmt., ECF No. 157 at ¶ 82), the Court's independent review of the video shows that Officer Williams was not attacking her. *See Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) ("Where the video obviously contradicts Plaintiff's version of the facts, we accept the video depiction instead of Plaintiff's account.").

Taking all of the information at Officer Williams's disposal at the time of the incident, and the Court's review of the record, the Court holds that Officer Williams had arguable probable cause to detain the Plaintiff. Accordingly, the Court grants summary judgment to Officer Williams on Plaintiff's false arrest and imprisonment claims.

### b. Excessive Force Claim

Plaintiff Khoury's next claim is that Officer Williams violated her Fourth Amendment right to be free from excessive force when he dislocated her elbow while unlawfully detaining her, and that this injury was exacerbated when she was pushed against Officer Williams's patrol car and being slammed on the ground. (Compl. at ¶ 110–116, ECF No. 1.) Officer Williams moves for summary judgment on this claim and argues that he is entitled to qualified immunity. The Court agrees with Officer Williams.

Officer Williams asserts that the evidence establishes that he used an appropriate level of force to detain Plaintiff Khoury. (Williams's Mot., ECF No. 147 at 15–18.) He claims that he struggled to control her and she resisted arrest. Moreover, he asserts that he never pushed or slammed the Plaintiff to the ground. He also contends that he was unaware for her injuries at the time. Even viewing the facts in the light most favorable to the Plaintiff, he argues that his actions were within legally permissible bounds.

Plaintiff Khoury responds that based on the totality of the circumstances, the force used by Officer Williams was objectively unreasonable because she had not violated any law, was not a threat to anyone, and did not meet the criteria to be detained under the Baker Act. (Pl.'s Resp., ECF No. 156 at 17.) She further claims that the facts from the Eleventh Circuit's opinion in *Davis v. Williams*, 451 F.3d 749 (11th Cir. 2006), where the panel denied qualified

immunity, should be applied here. She also argues that Officer Williams's behavior was so egregious that case law is unnecessary to support her claim. (*Id.* at 18.)

"The Fourth Amendment's freedom from unreasonable searches and seizures includes the right to be free from excessive force." *Mercado*, 407 F.3d at 1156. In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that courts must determine whether the seizure, or here, the alleged excessive force, was objectively reasonable. *See id.* at 396. To do so, courts must balance the "nature and quality of the intrusion" against the "governmental interest at stake." *Mercado*, 407 F.3d at 1157 (quoting *Graham*, 490 U.S. at 396). In assessing the reasonableness of the particular seizure, courts must look at the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempt to evade arrest by flight." *Id.* The officer's subjective intent does not affect the Court's determination. *Id.* at 397.

Because the Fourth Amendment reasonableness standard offers no bright-line rule, courts are directed to judge excessive use of force claims "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994) (internal quotation marks and citations omitted). In effect then, "qualified immunity applies unless the application of the standard would inevitably lead every reasonable officer in [Officer Williams's] position to conclude the force was lawful." *Id.*

Upon consideration of the facts in the light most favorable to the Plaintiff, and the relevant law in the Eleventh Circuit, the Court concludes that Officer Williams did not use excessive force in detaining Plaintiff Khoury. Plaintiff Khoury's injury, although unfortunate, is insufficient to warrant a finding of excessive force. In fact, it is well-established in the Eleventh Circuit that "a typical arrest involves some force and injury," *Rodriguez v. Farrell*, 280 F.3d 1341,1351 (11th Cir. 2002), and "the application of de minimis force, without more, will not support a claim for excessive force." *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000). As noted by the panel in *Rodriguez*: "[p]ainful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal." *Id.* at 1351 (citing cases). Moreover, Plaintiff Khoury was actively resisting when Officer Williams had arguable probable cause to detain her under the Baker Act. In an attempt to control the Plaintiff, Officer Williams used de minimis force to handcuff her. Even if the Plaintiff told Officer Williams he was hurting her—a fact which the video evidence appears to refute—an

officer's knowledge of such pain is not dispositive. *Rodriguez*, 280 F.3d at 1344–45, 1351.

In cases with similar facts to this one, the Eleventh Circuit has concluded that the officer did not exert excessive force and was entitled to qualified immunity. *See, e.g., Rodriguez*, 280 F.3d at 1344–45, 1351 (concluding that handcuffing during mistaken arrest, which resulted in the plaintiff suffering from the displacement of a key bone fragment, was not excessive force, despite the fact that the plaintiff screamed that he was in pain during the arrest and told the officer he was recovering from an injury); *Nolin*, 207 F.3d at 1255, 1258–59 (concluding that officer was entitled to qualified immunity when he grabbed the plaintiff "from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him"). In fact, the handcuffing technique used by Officer Williams is a "relatively common and ordinarily accepted non-excessive way to detain an arrestee." *Rodriguez*, 280 F.3d at 1351.

The Plaintiff points to *Davis* for support, but the Court finds it distinguishable. *Davis* involved a homeowner who, upon noticing flashing police lights outside his house, proceeded outside to see what was going on. *Davis*, 451 F.3d at 763. Officers were conducting a traffic stop, and told the plaintiff to leave. After some discussion and the officers indicating to the plaintiff that if he continued to speak to them, he would be arrested, the plaintiff proceeded towards his house. *Id.* With his back to the officers, the officers "grabbed [him] from behind, twisted his arms behind his back, and handcuffed him." *Id.* The plaintiff tried to communicate to the officers that he had a bad shoulder, but one of the officers responded by pushing his arm to cause the plaintiff greater pain. *Id.* at 764. The plaintiff was eventually handcuffed and forced to the ground, with one of the officers pushing on his bad shoulder. *Id.* Following this, one of the officers dragged the plaintiff to the police car, allowed a police dog out of its cage, and put the plaintiff into the cage, where he stayed while being driven to another location from which he later got transported to the police station. *Id.* He suffered from a torn rotator cuff, for which he underwent surgery, and other injuries. *Id.* The Court concluded that a reasonable jury could find that the officer's actions constituted excessive force because Mr. Davis "was not suspected of having committed a serious crime, he did not pose an immediate threat to anyone, and he did not actively resist arrest." *Id.* at 767.

Although some of the facts from *Davis* may appear similar at first glance, there are several facts that distinguish *Davis* from the Plaintiff's case. Firstly

and most importantly, the plaintiff in *Davis* was arrested without probable cause and here, there was arguable probable cause to detain Plaintiff Khoury. Second, the plaintiff in *Davis* did not actively resist arrest, whereas the Plaintiff herself has admitted to actively resisting Officer Williams's efforts to detain her. That fact alone weighs in favor of finding that Officer Williams's actions were reasonable under the circumstances. *See, e.g.*, *Lewis*, 561 F.3d at 1292 (concluding that officers were entitled to qualified immunity where the plaintiff was an "agitated and uncooperative man" who actively resisted arrest). Lastly, the Plaintiff's incident pales in comparison to Mr. Davis's in terms of the length of time she was subjected to force, the degree of force she endured, and the type of injury she suffered.

The Court concludes that the facts and law do not support the Plaintiff's excessive force claim. As a result, the Court grants summary judgment to Officer Williams as to the Plaintiff's excessive force claim.

### c. First Amendment Retaliation Claim

Plaintiff Khoury's last § 1983 claim is a First Amendment retaliation claim, in which she alleges that Officer Williams violated her First Amendment right by preventing her from recording him, slamming her to the ground, dislocating her elbow, and detaining her under the Baker Act. (Compl. at ¶ 117–125, ECF No. 1.) Officer Williams presents several arguments asserting that Plaintiff Khoury's claim must fail as a matter of law, since the evidence in the record demonstrates that Officer Williams did not prevent her from recording him and he did not retaliate against her for filming him. (Williams's Mot., ECF No. 147 at 18–21.) In response, the Plaintiff claims that the record evidence proves that he was bothered by the fact that she was filming him and that he detained her in retaliation for doing so. Plaintiff Khoury's only legal argument is that any reasonable officer would have recognized that she was exercising her First Amendment right to record police officers. (Resp. to Williams's Mot., ECF No. 156 at 19.) The Court finds that Officer Williams is entitled to summary judgment.

To state a First Amendment retaliation claim, a plaintiff must establish "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at 1254.

Although the Court recognizes that Plaintiff Khoury had a right to videotape Officer Williams, *see Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000), and that Officer Williams was aware that she was recording him, *see* Plaintiff's Video, ECF No. 142, the Court concludes that Officer Williams is entitled to qualified immunity. As already determined, Officer Williams had arguable cause to detain her under the Baker Act, which serves as a basis for granting qualified immunity, even if she was exercising her First Amendment right when that decision was made. *See Redd v. City of* Enterprise, 140 F.3d 1378, 1383-84 (11th Cir. 1998) ("[W]hen an officer has *arguable* probable cause to believe that a person is committing a particular public offense, he is entitled to qualified immunity from suit, even if the offender may be speaking at the time that he is arrested."). As a result, because of the Court's conclusion that Officer Williams had arguable probable cause to detain her, Plaintiff Khoury's First Amendment retaliation claim fails. *See Dahl v. Holley*, 312 F.3d 1228, 1236 (11th Cir. 2002) ("Whatever the officers' motivation . . . the existence of probable cause to arrest Dahl defeats her First Amendment claim."). Accordingly, the Court grants summary judgment to Officer Williams on the Plaintiff's First Amendment claim.

### d. State Law Claim for False Arrest and False Imprisonment

The Plaintiff's last claim is a state law claim for false arrest and imprisonment against the School Board and Officer Gregory Williams. Officer Williams claims he is entitled to immunity pursuant to Florida Statute 768.28. Although the School Board did not make substantive arguments on this claim, it did request summary judgment as to this claim. (School Board's Mot., ECF No. 148 at 2.) Plaintiff Khoury did not assert any arguments in response to the Defendants' motions. Nevertheless, the Court grants the Defendants' motions for summary judgment as to this claim.

Under Florida law, a claim for false arrest and false imprisonment are effectively the same claim. *Rankin v. Evans,* 133 F.3d 1425, 1430 n.5 (11th Cir. 1998) ("[U]nder Florida law, 'false arrest and false imprisonment are different labels for the same cause of action.'" (quoting *Weissman v. K-Mart Corp.*, 396 So. 2d 1164, 1164 n.1 (Fla. 3d DCA 1981)). Like under federal law, the existence of probable cause bars a claim for false arrest and false imprisonment. *See, e.g., id.* at 1435 ("[P]robable cause constitutes an absolute bar to both state and § 1983 claims alleging false arrest."); *Mas v. Metro. Dade Cty.*, 775 So.2d 1010, 1011 (Fla. 3d DCA 2001) (granting summary judgment because "probable cause is a complete bar to an action for false arrest and false imprisonment" (internal quotation marks and citations omitted)). Due to

the Court's ruling that Officer Williams had at least arguable probable cause to detain the Plaintiff, the Plaintiff's state law claim against the Defendants fails and summary judgment is warranted.

### 4. Conclusion

For the reasons stated, the Defendants' motions for summary judgment (ECF **No. 147, 148**) are **granted.** The Clerk shall **close** this case. Any other pending motions are **denied as moot**. The calendar call set for **March 27, 2018** and the trial set for the trial period beginning **April 2, 2018** are hereby canceled.

Done and ordered, at Miami, Florida, on March 26, 2018.

Robert N. Scola, Jr.
United States District Judge