UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-CV-20680-RNS

SUSAN KHOURY

     Plaintiff,

v.

THE MIAMI-DADE COUNTY SCHOOL BOARD,
a political subdivision of the State of Florida, and
GREGORY WILLIAMS, a resident of the State of
Florida,

     Defendants.

_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE
<u>MOTION FOR NEW TRIAL OR REMITTITUR</u>**

**I.  PROCEDURAL HISTORY**

On January 29, 2015, Officer Gregory Williams ("Officer Williams") involuntarily

committed Plaintiff Susan Khoury ("Ms. Khoury") to a mental health treatment facility under

Florida's Baker Act after being dispatched following a verbal altercation between Plaintiff and

non-party Doris Zubillaga. Ms. Khoury filed this 42 U.S.C. Section 1983 action against Officer

Williams, alleging several violations of her Fourth and First Amendment rights under both federal

and state law.  This Court found that Officer Williams was entitled to qualified immunity and

entered summary judgment in his favor on all claims.  [D.E. 188].

Ms. Khoury appealed that decision, which was affirmed in part and reversed in part. The

Eleventh Circuit found that the district court impermissibly weighed the evidence and assessed

(and discounted) Ms. Khoury's credibility, and ultimately held that there were disputed issues of

fact which precluded a finding that Officer Williams had arguable probable cause to detain Ms.

Khoury under the Baker Act to entitle him to qualified immunity on the Fourth and First Amendment claims. *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118 (11th Cir. 2021).  On remand, Khoury's Fourth and First Amendment claims against Officer Williams proceeded to trial.

## II.  FACTS ADDUCED AT TRIAL

During trial, Ms. Khoury explained that, for the five years preceding the incident with Officer Williams, the School Board had allowed a baseball league to overtake Glades Middle School and the area surrounding Ms. Khoury's home by conducting baseball games literally *every night* of the week.  Baseball participants and observers destroyed residents' lawns, left trash in the yards, and created an untenable parking issue in her neighborhood.  Ms. Khoury and her neighbors begged the School Board for help, but nothing changed.

On January 29, 2015, Ms. Khoury noticed a vehicle improperly parked in her neighborhood.  One of the gates to the field was also unlocked.  Ms. Khoury took a photograph with her phone to inform the School Board that the parking/gate problem had not been resolved, as the School Board promised her.  Doris Zubillaga confronted Ms. Khoury because she thought that Ms. Khoury took a photograph of the license plate of her improperly parked car.  Ms. Zubillaga called the police.

Officer Williams arrived approximately 20 minutes later.  Officer Williams spoke to Ms. Zubillaga first and then unlocked one of the gates to the field, which Ms. Khoury found to be odd. Officer Williams walked across the street and spoke to Ms. Khoury.  Eventually, Ms. Khoury asked Officer Williams for his name, but he refused to provide it.  Officer Williams then walked back across the street and spoke to Ms. Zubillaga.  Ms. Khoury became skeptical of Officer Williams' intentions and turned on her cell phone video recorder to document her interactions with him.  While standing across the street, Ms. Khoury asked Officer Williams for his name.  As seen

on the video, which the jury saw numerous times, Ms. Khoury stated, "Hey *officer*, can you tell me your name please." Officer Williams failed to answer.

Ms. Khoury then walked across the street and attempted to record the license plate to Officer Williams' police cruiser, which is a common method to identify police officers who refuse to identify themselves. As seen on the video, Ms. Khoury recorded Officer Williams' license plate while standing approximately 30 feet away him.

Nevertheless, when Officer Williams noticed Ms. Khoury recording him and his vehicle, he stated in a very menacing voice, "Why are you recording me!" Officer Williams violently charged toward Ms. Khoury, grabbed her left arm, and twisted it behind her back. Ms. Khoury felt excruciating pain shoot down her arm and heard a cracking sound. Ms. Khoury, a 56 year-old, 5'3 woman, continued to scream in pain and begged Officer Williams to stop. Ms. Khoury believed that Officer Williams, a former military veteran with extensive training, was on the verge of breaking her arm. Officer Williams continued to twist Ms. Khoury's arm and then pushed her to the ground.

It is important to pause and note that Ms. Khoury was not doing anything remotely illegal or threatening. As testified to at trial:

- When confronted by Doris Zubilaga, Ms. Khoury did not have a gun. She did not have a knife. She did not have a bat. She had no weapon in her hand at all during the encounter, and there was no physical altercation. (Tr. Vol. 1 at 162).

- Ms. Khoury wanted to deescalate the situation and avoid getting into a disagreement or confrontation with Doris Zubilaga. (Tr. Vol. 1 at 162).

- When Officer Williams approached her, Ms. Khoury did not have a gun. She did not have a bat. She did not have a knife. She did not have anything that was potentially harmful during the encounter. (Tr. Vol. 1 at 166).

- Officer Williams tried to grab her phone and then pulled her arm straight out, at which point she heard a popping sound. (Tr. Vol. 1 at 167).

- She did nothing to Officer Williams.  She did not push him.  She could not push him if she wanted to, and she would have no intent to push him. (Tr. Vol. 1 at 168).

- She did not punch Officer Williams, or strike him in any way, shape, or form. (Tr. Vol. 1 at 168).

- Officer Williams just grabbed her, pushed her towards the car, and began to try to handcuff her.  He then pushed her down and told her to sit. (Tr. Vol. 1 at 169).

- She did not voluntarily fall down to the ground of her own volition. (Tr. Vol. 1 at 170).

Officer Williams then transported Ms. Khoury to Kendall Regional Hospital for an involuntary mental health examination under Florida's Baker Act Statute.[1]  Ms. Khoury testified that, while at the hospital:

- She was concerned that she would be put under anesthesia while being Baker Acted against her will.  (Tr. Vol. 1 at 178). She wanted a family member present to act as a witness. *Id.* She did not want medication at all because in going to a mental institution, she wanted her full senses in order to know what was going on, to make her own decisions, and to be in control. (Tr. Vol. 1 at 184).

- When she was put in a room with a sign on it that said "Baker Act," it removed her dignity and her ability to be in control. She testified that "just talking about it" still gets to her.  (Tr. Vol. 1 at 179). She was concerned when she was being transported from a hospital to a mental health facility. (Tr. Vol. 1 at 179-180, 183). It was hard to talk about because she was in an environment with different people with unknown backgrounds. (Tr. Vol. 1 at 185).

---

[1] Florida's Baker Act, Fla. Stat. 394.463, provides that:

  (1) A [police officer may transport a person] to a receiving facility for involuntary examination if there is reason to believe that the person ***has a mental illness*** and because of his or her mental illness:

…

       ***There is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior***.

4

- She arrived at the hospital in the middle of the night or early morning on Thursday, and she remained there throughout the whole day Friday. (Tr. Vol. 1 at 181). She expected to be interviewed by a mental health professional the night she came in. (Tr. Vol. 1 at 182).

- She was frustrated because she was not seen right away but she was reluctant to show it due to how she could be perceived. (Tr. Vol. 1 at 181-182). She did not want people to think that there was something wrong with her, or that there was a problem.  (Tr. Vol. 1 at 182). She was in a situation she had never been in, where she did not know how she was supposed to behave. *Id.*

Regarding her time at Miami Behavioral, Ms. Khoury testified:

- It was a surreal experience. (Tr. Vol. 1 at 187). She was initially placed in a room alone with several beds, and another woman was later brought into the room. *Id.* The woman kept sitting there staring at her, causing Ms. Khoury to become scared.  *Id.*

- Because she was scared, she eventually left the room and sat outside overnight until sunlight, with no sleep from her arrival during rush-hour the previous day.  (Tr. Vol. 1 at 188). She did not know who the people were in the facility, and there was no security present. *Id.* She was also compelled to maintain total control to keep anybody from thinking anything about her. *Id.*

- She spent nearly three days at the institution before being seen by a doctor. (Tr. Vol. 1 at 188).

Dr. Alba Abreu, the psychiatrist at Miami Behavior testified:

- She is a psychiatrist with over 30 years of experience.  She evaluated Ms. Khoury after the incident, made the ultimate conclusion that Ms. Khoury did not suffer any major mental illness and that she did not pose a danger to herself or others. (Tr. Vol. 2 at 129).

- Dr. Abreu testified that if she believes somebody is a threat, she can keep them under observation, even against their will, for three days.  If after evaluation, there is no evidence of mental illness or danger, the individual can be discharged on the spot.  Dr. Abreu discharged Ms. Khoury on the same day she examined her. (Tr. Vol. 2 at 124).

- Dr. Abreu testified that Ms. Khoury was cooperative, calm, and her thoughts were organized; whereas if somebody is psychotic, their thoughts are incoherent. (Tr. Vol. 2 at 128).

- Dr. Abreu testified that based on her examination of Ms. Khoury, in which she is attempting to diagnose major mental illness, including psychosis, paranoia,

5

hallucinations, she determined within a reasonable degree of medical certainty that it is highly unlikely Ms. Khoury suffered from any mental illness. (Tr. Vol. 2 at 125).

In regard to psychological damages, Ms. Khoury testified the following:

- As a result of the incident, she suffered psychological damages without even realizing it at the time. It forever affected her employment, and she can never get security clearance again. It affects her because people assume that she is crazy, when she knows she is not. She lost her dignity, because unlike an arrest which can be expunged, this mental health incident will stay on her record forever. The incident has impacted her everyday life. (Tr. Vol. 2 at 35).


- Importantly, the incident affects because of the manner in which it was done. The Baker Act is meant for individuals who actually need help, and this was not a case of that. (Tr. Vol. 1 at 36).

Following Ms. Khoury's case-in-chief, Officer Williams moved for a directed verdict based on qualified immunity on Ms. Khoury's Fourth and First Amendment claims, which this Court denied. (Tr. Vol. 2 at 279-80); (Tr. Vol. 3 at 227).

Officer Williams then called Victor Agusto, Doris Zubillaga, and Jose Corraliza by video deposition. Officer Williams' witnesses attempted to contradict Ms. Khoury's testimony. However, none of his witnesses were able to contradict the fact that Ms. Khoury was a threat to herself or others, as required by the Baker Act Statute. More importantly, the jury had numerous opportunities to watch the video for themselves. The jury clearly rejected the contention that Ms. Khoury was a threat to herself or others (as they stated on the verdict form).

The jury returned a verdict in favor of Ms. Khoury on the Fourth Amendment claim, and in favor for Officer Williams on the First Amendment retaliation claim. [D.E. 279]. Important here, the jury specifically found that Officer Williams <u>did not</u> "have a reasonable basis – even if mistaken – to believe that without care or treatment there was a substantial likelihood that [Ms. Khoury] would cause serious bodily harm to herself or to others in the near future." *Id*.

The jury awarded Ms. Khoury the following damages: (a) $20,000 for the reasonable value of medical care and supplies that Ms. Khoury reasonably needed and actually obtained; (b) $50,000 for Ms. Khoury's physical injuries, including ill health, physical pain and suffering, disability, disfigurement, and discomfort that she experienced in the past; (c) $250,000 for physical harm, pain, disability, disfigurement, or discomfort that Ms. Khoury is reasonably certain to experience in the future; (d) $50,000 for mental and emotional distress, impairment of reputation, and personal humiliation that she experienced in the past; and (e) $150,000 for mental or emotional harm that Ms. Khoury is reasonably certain to experience in the future. *Id.* On March 23, 2022, the Court entered judgment in the total sum of $520,000 in favor of Ms. Khoury. [D.E. 281].

Officer Williams asks this Court to enter judgment in his favor as a matter of law on Ms. Khoury's Fourth Amendment claim, asserting that Ms. Khoury failed to prove her case and that he is entitled to qualified immunity. [D.E. 293]. Officer Williams also claims that he is entitled to remittitur of the jury's award of damages. *Id*.

## III. ARGUMENT

This Court must deny Officer Williams' motion because, viewing the evidence in the light most favorable to Ms. Khoury, she presented legally sufficient evidence that Officer Williams violated her Fourth Amendment right against illegal seizures. Officer Williams is not entitled to qualified immunity because the jury specifically found that he did not even have a mistaken belief that Ms. Khoury was a threat to herself or other, as required by the Baker Act statute. Officer Williams' request for the Court to find otherwise is completely improper. Finally, the Court should not grant a new trial or remittitur because the damages awarded are aligned with the weight of the evidence presented at trial, and the jury verdict is not so excessive as to "shock the conscience" of the court.

### i.    MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.  Standard for Rule 50(b) Motions

"The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion [under 50(a).]" *McGinnis v. American Home Mortgage Servicing, Inc*., 817 F.3d 1241, 1254–1255 (11th Cir. 2016). *See also Chaney v.  City of Orlando,* 483 F.3d 1221, 1227 (11th Cir. 2007) (alteration in original) (quoting 9A Charles Allan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537 (2d ed. 1995)). Thus, as with motions under Rule 50(a), "the question before a district court confronting a renewed Rule 50(b) motion is whether the evidence is "legally sufficient. . .to find for the party on that issue." Fed.R.Civ.P. 50(a)(1). In considering whether the verdict is supported by sufficient evidence, "the court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party." *Id. Beckwith v. City of Daytona Beach Shores,* 58 F.3d 1554, 1560 (11th Cir. 1995).  Furthermore, "[i]t is the jury's task—not [the court's]—to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Shannon v. Bellsouth Telecomms., Inc*., 292 F.3d 712, 715 (11th Cir. 2002) (quoting *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)). *See also McGinnis v. American Home Mortgage Servicing, Inc*., 817 F.3d 1241, 1254–1255 (11th Cir. 2016).

The Eleventh Circuit has repeatedly made clear that any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury. *U.S. S.E.C. v. Big Apple Consulting USA, Inc.,* 783 F.3d 786, 813

(11th Cir. 2015)(quoting *Doe v. Celebrity Cruises, Inc*., 394 F.3d 891, 903 (11th Cir. 2004)). In order to ensure that opposing counsel is not "ambushed" by a sufficiency of the evidence argument, a party renewing its Rule 50(a) motion after trial under Rule 50(b) cannot assert grounds in the renewed motion that it did not raise in the earlier motion.'" *Id.*, quoting *Celebrity Cruises*, 394 F.3d at 903 (internal quotation marks omitted)).

### B.  The Court Must Deny Officer Williams' Motion for Judgment as a Matter of Law

Officer Williams argues that the Court should grant him judgment as a matter of law on Ms. Khoury's Fourth Amendment claim because "no reasonable jury could find that [he] did not have probable cause to detain Ms. Khoury pursuant to the Baker Act."  [D.E. 293, pg. 7].  Officer Williams' position is inconsistent with the language in Florida's Baker Act, the prevailing law in this Circuit, and the facts adduced at trial.   Viewing the evidence at trial in the light most favorable to Ms. Khoury, a reasonable jury could conclude that Officer Williams had no legitimate basis to involuntarily commit her to a mental institution.[2]

The Baker Act authorizes a police officer to detain a person for involuntary mental health examination if "there is reason to be believe that the person has a mental illness and because of his or her mental illness" the person is "unable to determine for himself or herself whether examination is necessary" **and** there is "a substantial likelihood that without care or treatment the person will

---

[2] A jury has already found that Officer Williams lacked probable cause to detain Ms. Khoury under the Baker Act because although they found that Officer Williams had a reasonable basis even if mistaken to believe Ms. Khoury was exhibiting signs of mental illness, they determined Officer Williams did not have a reasonable basis even if mistaken to believe Ms. Khoury would cause serious bodily harm to herself or others.  Both prongs are required to meet the criteria for the Baker Act.

cause <u>serious bodily harm</u> to himself or herself or others in the <u>near future</u>, as evidenced by <u>recent behavior</u>." Fla. Stat. § 394.463(1). (emphasis added).  Officer Williams argues that the evidence presented at trial established that the facts and circumstances within Officer Williams' knowledge would cause a prudent person under the circumstances to believe that Ms. Khoury had a mental illness and was a threat to herself or others to satisfy the criteria for an involuntary examination under the Baker Act.  He supports this argument with superfluous testimony from multiple witnesses, including himself, all of which fail to adequately establish arguable probable cause to Baker Act Ms. Khoury.

The Eleventh Circuit has already specifically advised Officer Williams that "[v]ague notions about what a person might do—for example, a belief about <u>some</u> likelihood that without treatment a person <u>might</u> cause <u>some</u> type of harm at <u>some</u> point—does not meet the standard for arguable probable cause."  *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1126 (11th Cir. 2021).  The witness testimonies that Officer Williams cites to in his Motion amount to nothing more than this.  Furthermore, in making a probable cause determination on appeal, the Eleventh Circuit noted the following:

> "[T]he record shows Williams had already drawn the conclusion Khoury was 'not mentally well' simply because she didn't take him at his word that the cars were parked legally. But Officer Williams admits that Ms. Khoury was not violating the law or harming anyone by filming, and other eyewitnesses testified that Khoury was not a threat—her response was simply irrational. Yet even if, as reflected by these facts, Ms. Khoury was acting strangely, that alone does not form a basis under which a reasonable officer would conclude that Khoury was a danger to herself or others."

*Id*. at 1128.  The Eleventh Circuit ultimately found that, based on the information known to Officer Williams, no arguable probable cause existed to conclude Ms. Khoury was a danger to herself or

others.  *Id*.[3]  During trial, Dr. Alba Abreu, whose testimony was not presented on appeal, testified

that Ms. Khoury was not suffering from mental illness and that she did not pose a threat to others,

thus not meeting the criteria for the Baker Act.  Accordingly, Officer Williams argument that Ms.

Khoury was a "danger to the community," which the Eleventh Circuit already rejected, was only

weakened at trial.  See e.g. *Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002)("the same

evidentiary dispute that got the plaintiff past a summary judgment motion asserting the qualified

immunity defense will usually get that plaintiff past a Rule 50(a) motion asserting the defense…."

Equally importantly, the here specifically rejected Officer Williams claim that Ms. Khoury was a

threat to herself or others.

Now, Officer Williams seeks to take third bite at the apple in asserting again that there was

probable cause to Baker Act Ms. Khoury.  However, the Motion fails to satisfy the requirements

necessary to prevail under Rule 50(b) because the evidence presented at trial does not support his

position.  In evaluating all of the evidence, together with any logical inferences, **in the light most**

**favorable to Ms. Khoury,** Ms. Khoury clearly put forth legally sufficient evidence to support her

claim.  Accordingly, Officer Williams' Motion must be denied.

### C.  Officer Williams is Not Entitled to Qualified Immunity on the Fourth Amendment Claim

Although a defendant is entitled to renew a motion for judgment as a matter of law on the

basis of qualified immunity,  see *Wilkerson v. Seymour*, 626 F. App'x 816, 817–18 (11th Cir.

2015),  "it is the function of the jury as the traditional finder of facts, and not the Court, to weigh

conflicting evidence and inferences, and determine the credibility of witnesses." *Gregg v. U.S.*

---

[3] *See also May v. City of Nahunta*, 846 F.3d 1320, 1327–28 (11th Cir. 2017) ("In the context of a mental-health seizure. . .the Fourth Amendment requires the officer to have probable cause to believe the person is dangerous either to h[er]self or to others." (quotation marks omitted)); Fla. Stat. § 394.463(1)(b)(2).

*Industries, Inc.,* 887 F.2d 1462, 1468–69 (11th Cir. 1989) (quoting *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc)).  When ruling on a motion for directed verdict, Courts must accept the jury's credibility determination.  *Wilkerson,* 626 F. App'x at 819.  A tool used to apportion the jury and court functions relating to qualified immunity issues in cases that go to trial is special interrogatories to the jury.  *Johnson v. Breeden,* 280 F.3d 1308, 1318 (11th Cir. 2002).  Courts "are bound by the jury's … factual findings as discernible from the verdict."  *Wilkerson,* 626 F. App'x at 818.

Here, the jury specifically found that Officer Williams did not have a reasonable belief – even if mistaken – that Ms. Khoury posed a threat to do serious bodily harm to herself or others based on her past behaviors.  Accordingly, the jury implicitly found that Officer Williams did not have arguable probable cause to believe that Ms. Khoury met the Baker Act criteria.  The Court is bound by that finding, and accordingly, qualified immunity is inappropriate here.[4]

Furthermore, Officer Williams cannot assert grounds in his renewed Rule 50(b) Motion that he did not raise in his earlier Rule 50(a) motion.  *See Doe v. Celebrity Cruises, Inc.,* 394 F.3d 891, 903 (11th Cir. 2004)).  The Court cannot rely on new grounds to set aside the jury's verdict, as it would "ambush" opposing counsel with a sufficiency of evidence argument at a point in the trial proceedings when it is too late to address possible insufficiencies.  *Id.*

Here, during the directed verdict at trial, Officer Williams woefully failed to articulate any factual or legal reasons why he was entitled to qualified immunity.  He only stated that he was entitled to qualified immunity.  Accordingly, in addition to the reasons stated above for denying qualified immunity, Officer Williams waived his immunity arguments.

---

[4] The Eleventh Circuit has already ruled that Ms. Khoury's Fourth Amendment right against improper Baker Acts was clearly established.

ii.       **MOTION FOR NEW TRIAL AND/OR REMITTITUR REGARDING DAMAGES**

     **A. Standard for Remittitur.**

A "jury verdict may be vacated as excessive only if it is so large as to shock the conscience." *Ash v. Tyson Foods, Inc*., 664 F.3d 883, 899 (11th Cir. 2011) (quoting *Sykes v. McDowell*, 786 F.2d 1098, 1105 (11th Cir.1986)): *Christopher v. Florida*, 449 F.3d 1360, 1368 (11th Cir. 2006) ("'a new trial should only be ordered where the verdict is so excessive as to shock the conscience of the court.'") (quoting *Simon v. Shearson Lehman Bros., Inc.,* 895 F.2d 1304, 1310 (11th Cir.1990)).  In determining whether a verdict is excessive, the applicable standard is whether the jury's verdict is "'grossly excessive, inordinate, shocking to the judicial conscience, outrageously excessive, so large as to shock the conscience of the court, [or] monstrous." *Wilson v. Taylor,* 773 F.2d 1539, 1548 (11th Cir. 1984) (*quoting Grunenthal v. Long Island R. Co.*, 89 S.Ct. 331, 333 n.4 (1968)).

In assessing the appropriateness of an award of compensatory damages, courts look to: (1) the size of the award; (2) the rational relationship between the award and the evidence adduced at trial; and (3) awards in similar cases.  *Copley v. BAX Glob., Inc.*, 97 F. Supp. 2d 1172 (S.D. Fla. 2000). Also, "[g]eneral compensatory damages do not have to be proven with a high degree of specificity, and they may be inferred from the circumstances or proven through testimony." *Davis v. Florida Agency for Health Care Admininstration*, 612 Fed. Appx. 983, 987 (11th Cir. 2015) (quoting *Akouri*, 408 F.3d at 1345). "'A plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress based on a constitutional violation." *Tucker*, 229 Fed. Appx. at 827 (quoting *Akouri*, 408 F.3d at 1345) ; *Davis*, 612 Fed. Appx. at 987. The Eleventh Circuit has instructed that it is "particularly deferential to the fact finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so subjective

and evaluating it depends considerably on the demeanor of the witnesses." *Tucker v. Housing Authority of Birmingham Dist*., 229 Fed. Appx. 820, 826–827 (11th Cir. 2007) (quoting *Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1315 (11th Cir. 2001) (internal quotation omitted).

In *Ferrill v. Parker Grp., Inc.,* 168 F.3d 468, 476 (11th Cir. 1999), the Eleventh Circuit upheld an award of compensatory damages, finding that that harm was subjective and its evaluation was dependent on the witness's demeanor.  Accordingly, the Court did not disturb the jury's award of compensatory damages in a § 1981 discrimination case.  The Court further noted that the court was "particularly deferential to the fact finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so 'subjective and evaluating it depends considerably on the demeanor of the witnesses.'" *Ferrill*, 168 F.3d at 476.  In *Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1315-16 (11th Cir. 2001) the Eleventh Circuit stated:

> In the instant case, the jury reached it decision regarding the proper amount of damages after testimony from Griffin and others. . . . The district court instructed the jury that emotions and sympathy were not to play any role in their deliberations and that compensatory damages were not allowed as punishment. Absent evidence to the contrary, we presume that juries follow the law as instructed [citation omitted]. As such, we do not believe the district court abused its discretion in refusing to grant a remittitur.

*See also, Tucker v. Housing Authority of Birmingham Dist*., 507 F.Supp.2d 1240 (N.D. Ala. 2006)(noting that because the jury awarded damages for emotional distress, the court was "particularly deferential to the fact finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so 'subjective and evaluating it depends considerably on the demeanor of the witnesses.'").

**B.      Remittitur is Inappropriate**

Here, the evidence established that Plaintiff suffered emotional distress, humiliation, embarrassment, as well as physical injuries as a result of being unlawfully Baker Acted.[5]  The jury found those damages substantial enough to award $500,000.00 in compensatory damages.  *See* the March 17, 2022, Verdict.  As set forth below, the Jury's award was neither "monstrous" nor "excessive."  To the contrary, the Jury's Verdict was reasonable, rational and in line with other similar cases.

### Jury's Award of $200,000.00 for Past and Future Mental and Emotional distress, Impairment of Reputation, Personal Humiliation Must be Upheld

In Florida's state and federal courts, awards of $200,000.00 or more for emotional distress, humiliation and embarrassment damage claims, such as the ones that Plaintiff made in the instant case, are not uncommon.  In *Barton Protective Services, Inc. v. Faber,* 745 So. 2d 968 (Fla. 4th DCA 1999), which was affirmed by the Fourth DCA in 1999, the plaintiff, who was not physically injured, was awarded $225,000 as compensatory damages for false arrest in violation of 42 U.S.C. § 1983.  In *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001), the Eleventh Circuit found that the trial court did not abuse its discretion in upholding an award of $500,000.00 for sexual harassment (and separate damage of $1,500,000.00 for rape) in a § 1983 case.  *See also Edman v. Marano*, 177 Fed.Appx.884 (11th Cir. 2006)(finding that the district court did not abuse

---

[5] The jury awarded Ms. Khoury the following damages: (a) $20,000 for the reasonable value of medical care and supplies that Ms. Khoury reasonably needed and actually obtained; (b) $50,000 for Ms. Khoury's physical injuries, including ill health, physical pain and suffering, disability, disfigurement, and discomfort that she experienced in the past; (c) $250,000 for physical harm, pain, disability, disfigurement, or discomfort that Ms. Khoury is reasonably certain to experience in the future; (d) $50,000 for mental and emotional distress, impairment of reputation, and personal humiliation that she experienced in the past; and (e) $150,000 for mental or emotional harm that Ms. Khoury is reasonably certain to experience in the future.  *Id.*  On March 23, 2022, the Court entered judgment in the total sum of $520,000 in favor of Ms. Khoury.  [D.E. 281].

its discretion in a § 1983 false arrest action by denying defendants' motions for new trial and for

remittitur on ground that jury's award of $225,000.00 was grossly excessive or unreasonable).

The cases cited by Defendant are inapposite. In *Johnson v. White*, 2019 WL 8222853 (N.D.

Fla. Jan 9, 2019), the plaintiff was not confined against his will for 72 hours while Khoury was

involuntarily committed to a psychiatric facility. *Smith v. City of Oakland*, 2011 WL 5325484, at

*4 (N.D. Cal. Nov. 3, 2011), also relied upon by Defendant, is not on point. In *Smith*, the plaintiffs

were unlawfully stopped by the police and strip searched. Although they did not suffer any

physical injuries, the jury awarded them actual damages in the amount of $105,025 and $100,025,

respectively, rather than $25,000 as erroneously argued by Defendant. The issue was whether the

punitive damages amount was proper in light of the *Gore* factors laid out by the Supreme Court

when determining whether the amount of punitive damages awarded comported with the purpose

of punitive damages. The California court in *Smith* reduced the amount of punitive damages in

light of the Gore prongs, which are not at issue in this case. In *Davis v. Becht*, 2007 WL 4523028

(M.D. Fla. Mar. 8, 2007), the jury decided an award of damages in an excessive force case under

the circumstances present in that particular case. In *Ajamu v. City of Orlando*, 2003 WL 24016196

(Nov. 6, 2003), the jury ruled in favor of Plaintiff on the false arrest/detention claim and privacy

rights violation claim. However, unlike in the instant case, they ruled in favor of Defendant City

of Orlando on the battery claim and on the negligence claim. As to the claimed violations of 42

U.S.C. 1983, the jury ruled in favor of the defendant. Nevertheless, despite finding in favor of the

defendant on various counts, the parties settled for $160,000.00. Accordingly, Defendant's

argument that the jury awarded only $20,000 to Ajamu is factually incorrect.

Here, Khoury's award was consistent with damages for mental anguish and emotional

suffering approved by the Eleventh Circuit in *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th

Cir. 2001). Unlike Khoury's claims of 42 U.S.C. 1983 violation, the Plaintiff in *Griffin* was awarded $500,000.00 against the City of Opa-Locka for mental suffering resulting from sexual harassment in the workplace.  Like Khoury, Griffin's damages for the sexual harassment (Griffin was also separately awarded $1,500,000.00 for rape) were described as having a "devastating personal impact," such that Griffin continues to experience the emotional repercussions of the . . . harassment.  *Id*. at 1315.  Khoury similarly testified that being physically "manhandled," having her elbow dislocated and being thrown to the ground in her own neighborhood was humiliating and embarrassing.  What's more, Ms. Khoury testified that the sleepless 72-hours that she spent in a psychiatric ward were traumatizing and frightening, which included being confined to a room with a person who was clearly suffering from mental illness.  And since that time, Ms. Khoury has had to endure the stigma and record of having been Baker Acted, which she has been required to disclose on employment applications, among other places.

Against this backdrop, the award of $200,000.00 for emotional harm, distress, embarrassment, impairment of reputation and personal humiliation damage claims that Plaintiff is making is reasonable and appropriate. In the case at bar, Ms. Khoury testified that the wrongful Baker Act and being forced into a psychiatric ward against her will was jarring, terrifying and emotionally devastating. As Ms. Khoury testified, it was humiliating and embarrassing for her to be manhandled by Officer Williams in her own neighborhood and in front of her long-time neighbors. What's more, the Defendant's conduct towards Plaintiff was outrageous, and resulted in serious and real damages to the Plaintiff. Under these circumstances, any diminution of the Defendants' financial responsibility to the Plaintiff would be improper.

### The Jury's Verdict of $300,000.00 for Physical Harm, Pain and Suffering, Disability, Disfigurement <u>or Discomfort in the Past and Future Must Be Upheld</u>

As the testimony and evidence at trial established, Officer Williams caused significant physical injuries to Ms. Khoury while unlawfully Baker Acting her.  In addition to violently dislocating her left elbow, Officer Williams inflicted soft tissue injuries to Ms. Khoury's neck and back.  Ms. Khoury's physical pain were evident and clear on the video depicting her unlawful apprehension and detention. As the Court knows, the jury was forced to endure that video many times over the course of the 3-day trial and yet asked to see the video again during deliberation. During that video, Ms. Khoury's painful screams, crying and pleas for help are undeniable. Clearly, the Jury was moved and shaken by what they witnessed.

The injuries that Officer Williams unlawfully thrust upon Ms. Khoury necessitated that she receive emergency medical care and treatment at the Kendall Regional Medical Center's Emergency Room.  As the medical records state, Ms. Khoury was in a great pain upon arrival and was afraid (in light of what Officer Williams had done to her) to have anesthesia or medical procedures performed until after her family members had arrived at the hospital.  Once her family arrived, Ms. Khoury underwent a medical procedure known as Closed Manipulation of Dislocation under Anesthesia.  This procedure involves doctors forcefully relocating and repositioning the elbow back into joint.

Following the emergency medical procedure and through present day, Ms. Khoury suffers pain, swelling, discomfort and limitations of her left elbow – mostly during activities of daily living.  These are permanent injuries for which she was assigned a partial permanent impairment rating of 10-12% by her treating doctor.  And as she gets older and her body wears, there is a 0% chance that the condition of her left elbow will improve.  Ms. Khoury's left elbow will most likely deteriorate at an accelerated pace given the injuries she sustained.  It is significant to point out that before Officer Williams got a hold of her, Ms. Khoury had no pre-existing conditions of her left

elbow.  Moreover, as Ms. Khoury's undisputed testimony established, the pain and discomfort that she experiences in her left elbow today brings her back every time to the painful memories of January 29, 2015.

Following release from the Hospital and psychiatric ward, Ms. Khoury's injuries and physical pain continued.  This required her to seek medical care and treatment including visits to an Orthopedist (Dr. Lazarin), physical and chiropractic therapy sessions with a Chiropractor (Dr. Goodrich), diagnostic testing (MRI), a supportive device for her elbow and to take medications. Again, these are all injuries and resulting medical care that was unnaturally thrust upon Ms. Khoury.  Not only did this care cost money, it created a major inconvenience and burden that Ms. Khoury should never have been forced to bear.

### The Jury's Allowance of $20,000.00 for Medical Expenses Reasonably Needed and Actually Obtained Must be Upheld

As the Court recalls, Ms. Khoury incurred medical expenses due to the injuries that she sustained. And it is beyond dispute that her past medical expenses total $12,795.00 without considering interest on the unpaid, outstanding balances.  What's more, at least a portion of Ms. Khoury's medical expenses were still unknown at the time of trial because Kendall Regional Medical Center apparently did not have Ms. Khoury's correct social security number. It is safe to assume that at some point, Kendall Regional will be sending Ms. Khoury a bill for the Emergency medical care, treatment and procedures that she received that night.  To that end, the Jury was justified in allowing additional damages for medical expenses that Ms. Khoury incurred and would ultimately be responsible to pay. Moreover, given her testimony regarding the on-going pain and swelling of her left elbow (and likelihood that the condition will only worsen with age), it is entirely reasonable that the Jury award additional monies for medical care that Ms. Khoury will

reasonably need in the future.  Accordingly, this Court should not disturb the Jury's award of $20,000.00 for medical expenses.

## CONCLUSION

For the reasons set forth above, Ms. Khoury respectfully requests that the Court deny Officer Williams' renewed motion for judgment as a matter of law, and the alternative motion for new trial or remittitur with regard to damages.

Respectfully submitted,

Hilton Napoleon, II, Esq., FBN 17593
RASCO KLOCK PEREZ & NIETO
2555 Ponce de Leon Blvd., Suite 600
Coral Gables, Florida 33134
Telephone: 305.476.7115
Facsimile: 305.675.0850

By:  */s/ Hilton Napoleon, II*
        Hilton Napoleon, II

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 18, 2022, I have filed the foregoing document with the Clerk of the Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel and parties of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those parties who are not authorized to receive electronically Notices of Electronic Filing.

By:  */s/ Hilton Napoleon, II*
        Hilton Napoleon, II